# United States Court of Appeals
## For the First Circuit

---

No. 99-2357

JOSE COSTA,

Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE,

Respondent.

---

PETITION FOR REVIEW OF AN ORDER OF REMOVAL OF

THE BOARD OF IMMIGRATION APPEALS

---

Before

Selya, <u>Circuit Judge</u>,

Coffin and Bownes, <u>Senior Circuit Judges</u>.

---

<u>Lidia M. Sanchez</u>, with whom <u>Cooper & Sanchez</u> was on brief, for petitioner.
<u>Paul D. Kovac</u>, Attorney, Office of Immigration Litigation, United States Department of Justice, with whom <u>David W. Ogden</u>, Acting Assistant Attorney General, Civil Division, and <u>Mark C. Walters</u>, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

---

November 28, 2000

---

**SELYA, Circuit Judge.** Petitioner-appellant José Costa, a forty-five-year-old Cape Verdean who has no known criminal record, claims that he was eligible to apply for suspension of deportation, but that the Board of Immigration Appeals (BIA) incorrectly refused to recognize that fact. In the alternative, he claims that the BIA erred by failing to treat him as eligible for suspension of deportation on the basis of equitable estoppel. Finding his arguments unconvincing, we deny his petition for review.

## I.

### Background

This case plays out against a kaleidoscopic backdrop of recent developments in immigration law. We focus on one small area of change. Prior to April 1, 1997, non-criminal aliens could apply for suspension of deportation, provided that they had accumulated seven years of continuous physical presence in the United States and had satisfied certain other requirements. See Immigration and Nationality Act (INA) § 244, 8 U.S.C. § 1254 (repealed 1997). Congress's enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, 3546 (codified as amended in scattered sections of 5, 8, 18, 28, 42, & 48 U.S.C.), eliminated that option; IIRIRA abolished

-3-

suspension of deportation entirely and replaced it, effective April 1, 1997, with a more restrictive procedure called cancellation of removal. IIRIRA § 304(a)(3), 8 U.S.C. § 1229b(b)(1) (1999) (replacing INA § 244 with a new § 240A). Eligibility for cancellation of removal requires, inter alia, a minimum of ten years of continuous physical presence in the United States. Id.

This shifting series of congressional directives makes timing very important. Under those directives, non-criminal aliens placed in deportation proceedings prior to April 1, 1997, are eligible for suspension of deportation if they meet the familiar requirements of INA § 244, whereas those placed in deportation proceedings after that date are eligible only for cancellation of removal under IIRIRA § 340(a)(3). This line-drawing matters here inasmuch as the petitioner satisfies the criteria for INA § 244 relief but not the more stringent criteria imposed by IIRIRA § 340(a)(3). Because he lawfully entered the United States in June of 1989, overstayed his six-month nonimmigrant visa, and made a life for himself here, he had more than seven, but fewer than ten, years of continuous physical presence in the United States when suspension of deportation metamorphosed into cancellation of removal.

-4-

With a change in the law looming and the calendar working against him, the petitioner decided to take matters into his own hands. On March 18, 1997 — after Congress had passed IIRIRA but prior to the date on which the abolition of INA § 244 took effect — the petitioner, accompanied by an attorney, presented himself at the local Immigration and Naturalization Service (INS) office in Providence, Rhode Island, requesting that he be placed in deportation proceedings. He asserts that the INS issued an Order to Show Cause (OSC) at that time, and although the INS questions this assertion in its brief — the OSC was never produced in the course of subsequent proceedings — we assume arguendo the veracity of the petitioner's account.

In all events, the INS did not file the OSC with the Immigration Court prior to the April 1 cut-off date.[1] Instead, it served the petitioner with a Notice to Appear (NTA) on June 19, 1997, and thereafter filed the NTA with the Immigration Court.

Given this sequence of events, the petitioner's burden is to show that his case falls under the old regime rather than the new. The adequacy of this showing depends, in the first

---

[1]The Immigration Court (sometimes called the Office of the Immigration Judge) is an administrative court that operates under the hegemony of the Executive Office of Immigration Review, a unit of the Department of Justice. It functions independently of the INS.

instance, on the statutory text. In pertinent part, IIRIRA provides that "an alien who is in exclusion or deportation proceedings as of the [statute's] effective date" (April 1, 1997) is not subject to the new rules. IIRIRA § 309(c)(1). The parties interpret this language differently. The petitioner asserts that the issuance of an OSC invariably marks the commencement of deportation proceedings, and that, therefore, he was in deportation proceedings from and after the date that such a document was served upon him. Since that event occurred prior to April 1, 1997, his thesis runs, the more favorable suspension of deportation paradigm applies to his case. The INS demurs, asserting that the petitioner was not in deportation proceedings until the agency filed the NTA in the Immigration Court. Since that event occurred after April 1, 1997, the INS posits that the less favorable cancellation of removal paradigm applies.

The Immigration Judge (IJ) accepted the INS's view, applied the more onerous criteria, rejected the petitioner's estoppel argument, and ordered removal. The petitioner sought further administrative review but the BIA dismissed his appeal. He now prosecutes this petition for judicial review.[2] To the

---

[2]Post-IIRIRA, the proper respondent in a petition for judicial review of an order of removal is the Attorney General, not the INS. See 8 U.S.C. § 1252(b)(3)(A). The petitioner, however, flouted this rule and named the INS instead of the Attorney General. Because the error appears harmless, we

extent that the petition presents an abstract legal question concerning the effect, if any, of a served but unfiled OSC on the choice of law seemingly demanded by the confluence of two different statutory schemes, we afford de novo review. Gailius v. INS, 147 F.3d 34, 43 (1st Cir. 1998); Fergiste v. INS, 138 F.3d 14, 17 (1st Cir. 1998).

## II.

## Discussion

We divide our analysis into two segments, corresponding to the petitioner's broadsides.

### A.

### When Deportation Proceedings Commenced

By statute, the Attorney General has authority to "establish such regulations . . . as he deems necessary for carrying out his authority under the [immigration laws]." 8 U.S.C. § 1103(a)(3). The Attorney General has delegated this rulemaking power to the INS. 8 C.F.R. § 2.1. The INS's view of when the petitioner first became embroiled in deportation

overlook the discrepancy on this occasion.

proceedings draws sustenance from a regulation promulgated pursuant to this authority. The regulation provides explicitly that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 3.14(a). This regulation hardly could be clearer and, under familiar principles, ordinarily would be entitled to great weight. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); Sidell v. Commissioner, 225 F.3d 103, 109 (1st Cir. 2000). Here, however, the petitioner scoffs at the suggestion that deference is due. He claims that our decision in Wallace v. Reno, 194 F.3d 279 (1st Cir. 1999), blunts the force of the regulation. Our next task, then, is to determine what effect, if any, Wallace has on the applicability of the regulation in the circumstances at hand.

The Wallace case did not primarily involve IIRIRA, but, rather, a complementary set of changes to the immigration laws effected by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Wallace, a native of Jamaica who immigrated to this country in 1988, was convicted of a drug-trafficking offense in February 1996, following a guilty plea. On March 20, 1996 (prior to AEDPA's April 24, 1996, effective date), the INS served him with

an OSC challenging his immigration status. It filed the OSC with the Immigration Court on June 14, 1996 (subsequent to AEDPA's effective date). On December 18, 1996, Wallace conceded deportability. An IJ thereafter found him ineligible to apply for a discretionary waiver of deportation under section 212(c), reasoning that the newly-enacted ban on waivers of deportation for aliens convicted of certain aggravated felonies, contained in AEDPA § 440(d), had enlarged the category of statutorily ineligible individuals to include criminal aliens who, like Wallace, had been convicted of drug-trafficking crimes, regardless of length of sentence.[3] The BIA dismissed Wallace's administrative appeal.

Wallace then filed a habeas application in the district court, "claiming that it was impermissibly retroactive to apply AEDPA's new limitation on waivers to him." Wallace, 194 F.3d at 282. The retroactivity argument pertained directly to Wallace's pre-AEDPA conviction and to the legitimacy of using that conviction as a fulcrum to force him out of the country under the new law. See id. The district court granted the requested

_____

[3]The type of relief pursued by Wallace is similar, but not identical, to that pursued by Costa. Wallace sought relief under INA § 212(c), which applies to criminal aliens. By contrast, Costa seeks relief under INA § 244, which applies in somewhat different terms to non-criminal aliens. See Cipriano v. INS, 24 F.3d 763, 764 (5th Cir. 1994) (limning both forms of relief).

relief.  Wallace v. Reno, 24 F. Supp. 2d 104 (D. Mass. 1998).

We affirmed, albeit on different grounds.[4]

Faced with a close question as to whether the enlarged ban on waivers could constitutionally be applied to a person who, prior to AEDPA's effective date, had pled guilty to a felony which at the time of the plea did not render the perpetrator ineligible for suspension of deportation, we concluded that Congress did not intend the ban on discretionary waivers to operate in so draconian a fashion.  Wallace, 194 F.3d at 286-87.  In that context, we rejected the INS's contention that 8 C.F.R. § 3.14(a) controlled and held that, for purposes of his habeas case, Wallace had been placed in deportation proceedings on March 20, 1996 (when the INS served him with an OSC).  Id. at 287.  In that connection, we wrote:

> In this case we are not concerned with the INS's internal time tables, starting points, due dates, and the like but with the judicial question of retroactivity.  This question turns on considerations unrelated to the purpose of INS regulations — primarily (in the absence of statutory guidance) with the evil Congress sought to prevent and the realities of reasonable reliance or settled expectations on the part of litigants.  From this standpoint, we

---

[4]We consolidated Wallace's appeal with an appeal taken by an unrelated party, one Lemos, and Judge Boudin wrote a single opinion encompassing both appeals.  Because the petitioner's argument derives from the panel's treatment of Wallace rather than Lemos, we limit our account accordingly.

> think that when an order to show cause is
> served on the alien, the deportation process
> has effectively begun and expectations
> properly form, even if there is no actual
> reliance.

Id. (emphasis in original).

Wallace is inapposite here.  There, we were concerned that once criminal proceedings against an alien had begun, the existing rules applicable to suspension of deportation likely would command his attention and foster reliance during his decisionmaking in connection with the pending criminal charges.  Id.  Given the likelihood that such rules might have played a significant role in the alien's strategic choices when defending against the pre-AEDPA criminal charges (e.g., deciding whether to plead guilty or to stand trial), changing them after the game had started raised a special set of fairness concerns.  Id.

The instant case, which involves a non-criminal alien, is a horse of a different hue.  Unlike Wallace, the petitioner is not a criminal alien and, unlike Wallace, he is not subject to deportation on the basis of a criminal conviction that left him eligible for section 212(c) relief when it occurred.  It follows inexorably that the petitioner was not confronted with the same need to make strategic choices as was a criminal alien in Wallace's position.  It likewise follows that retroactivity concerns, central to our decision in Wallace, are absent in this

-11-

case. Although it is true that, from a theoretical standpoint, the petitioner faced deportation from the time he overstayed his visa, the government did not force him to make choices in reliance on existing law — and then pull the rug out from under him by revising that law. Thus, while the petitioner, when he presented himself at the local INS office, might have hoped to take advantage of the favorable rules that he knew were being phased out, the decision to attempt to accelerate consideration of his immigration status was not one made under the compulsion of pending criminal charges (or under any comparable compulsion, for that matter).

Moreover, the petitioner cannot be heard to complain that he was unfairly mousetrapped by the service of an OSC. After all, Congress passed IIRIRA on September 30, 1996 — nearly six months before the petitioner self-reported to the Providence INS office. IIRIRA § 309(a), 8 U.S.C.A. § 1101 (Note). The petitioner has not argued that his appearance on the INS's doorstep less than two weeks before the new law's effective date was a coincidence. We safely can assume, therefore, that the petitioner was on notice of the impending shift from suspension of deportation to cancellation of removal when he invited the issuance of an OSC. In light of that fact, he cannot convincingly claim, as could Wallace, that he relied to his

detriment on a prior legal regime.[5]  Cf. Martin v. Hadix, 527

U.S. 343, 360 (1999) (concluding that passage of a statute

eliminated retroactivity concerns by placing attorneys on notice

of certain fee constraints, thus undermining any reasonable

expectation of higher fees in respect to engagements undertaken,

but not completed, between the day of passage and the effective

date of the fee constraints).

      Wallace is inapposite for another reason as well.  That

case arose in the habeas context.  Here, unlike in Wallace, we

are dealing with direct review of a BIA order.[6]  For that reason,

---

[5]Two other cases cited by the petitioner, namely, Alanis-Bustamante v. Reno, 201 F.3d 1303 (11th Cir. 2000), and Pena-Rosario v. Reno, 83 F. Supp. 2d 349 (E.D.N.Y. 2000), are cast in the Wallace mold.  Both of them lean heavily on the language of the Wallace court.  Alanis-Bustamante, 201 F.3d at 1309; Pena-Rosario, 83 F. Supp. 2d at 362-63.  Moreover, both of them involve the question of whether the enlarged definition of "aggravated felony" contained in AEDPA § 440(d) can constitutionally be applied to criminal convictions antedating AEDPA's effective date.  Alanis-Bustamante, 201 F.3d at 1307-08; Pena-Rosario, 83 F. Supp. 2d at 363-65.  For these reasons, the two cases, like Wallace itself, fail to assist the petitioner here.

[6]We note in passing that, aside from the two distinctions discussed herein, there are other differences between this case and Wallace.  First, the OSC at issue here was served but not filed, whereas the OSC in Wallace was both served and filed. Wallace, 194 F.3d at 282.  Second, this case arises under IIRIRA and its permanent rules, and the Wallace court did not purport to deal with that situation.  Id. at 288 (cautioning that the decision "applies only to cases governed by IIRIRA's transitional rules; the permanent IIRIRA regime could affect various of the issues discussed and we leave those cases for another day").  Third, Wallace sought relief under INA § 212(c),

-13-

"the INS's internal time tables, starting points, . . . and the like," immaterial in Wallace, are of critical importance. Straightforward judicial review of an administrative order cannot proceed without reference to agency time tables, starting points, and the like — and in this case, straightforward judicial review is all that is necessary. Because the petitioner is a non-criminal alien, he is subject to a simple removal proceeding, with no extraneous concerns about the collateral consequences of past activity. Under such circumstances, the agency's application and interpretation of the pertinent IIRIRA provision, contained in a regulation promulgated under legislative mandate, is controlling as long as it is not obviously erroneous or inconsistent with the language of the statute. Stinson v. United States, 508 U.S. 36, 45 (1993); Sidell, 225 F.3d at 109. The regulation at issue here, 8 C.F.R. § 3.14(a), easily passes this undemanding test.

This is especially true because the Attorney General (and, in turn, the INS, as her designee) has broad discretion in deciding, administratively, whether and when to pursue deportation against an alien. See Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-85 (1999); United States

rather than INA § 244. See supra note 3. We take no view of the significance, if any, of these other distinctions.

v. Camacho-Bordes, 94 F.3d 1168, 1174 (8th Cir. 1996); Cabasug v. INS, 847 F.2d 1321, 1324 (9th Cir. 1988); Cervantes v. Perryman, 954 F. Supp. 1257, 1265 (N.D. Ill. 1997); see also 8 U.S.C. § 1227(a). The Attorney General's "responsibility in this regard is akin to his responsibility for enforcing the criminal laws: in both situations, he has discretion to refrain from instituting proceedings even though grounds for their commencement may exist." Johns v. Department of Justice, 653 F.2d 884, 889 (5th Cir. 1981). An alien illegally in the United States cannot force the Attorney General's hand by the simple expedient of calling attention to his status and demanding immediate action.

In a last-ditch effort to sidestep the regulation, the petitioner argues that the INS acted in bad faith when it failed to file the OSC with the Immigration Court. This argument will not wash.

In United States v. Gertner, 65 F.3d 963 (1st Cir. 1995), we explained what was necessary to overcome the presumption of good-faith action by the government. The party seeking to overcome that presumption "must articulate specific allegations of bad faith and, if necessary, produce reasonably particularized evidence in support of those allegations." Id.

at 967.  This is "a significant burden," id., and the petitioner has failed to carry it here.  We explain briefly.

The petitioner focuses his argument exclusively on the INS's failure to file the OSC with the Immigration Court.  By his own account, however, he solicited the OSC a mere thirteen days before the repeal of INA § 244 took effect, and the INS therefore had less than two weeks within which to perfect the filing.  The petitioner has identified no regulation or custom that establishes a fixed interval within which an OSC, once served, should be filed.  Nor has he presented any probative evidence that the INS promised him it would file the OSC with the Immigration Court within the thirteen-day window.  We are not prepared to say, on an otherwise empty record, that the mere passage of thirteen days supports a claim of bad faith.  Cf. United States v. Alegria, 192 F.3d 179, 189 (1st Cir. 1999) (explaining that carelessness on the part of prosecutors "does not suffice to make out a case of bad faith").

That ends this aspect of the matter.  We uphold the BIA's administrative determination that the petitioner was not in deportation proceedings until the NTA was filed with the Immigration Court.  See Chevron, 467 U.S. at 837 (declaring that regulations promulgated by an agency under a statutory scheme within its purview will be given controlling weight unless

"arbitrary, capricious, or manifestly contrary to the statute");

Sidell, 225 F.3d at 109 (explaining that an agency's interpretation of its own regulations is entitled to great deference). And since that filing occurred after April 1, 1997, the BIA did not err in ruling that section 244 relief no longer was available.

## B.

### Equitable Estoppel

The petitioner has a fallback position. He suggests that the INS should be estopped from proceeding under the new rules. In his view, this estoppel arises because (1) the INS should have filed the OSC with the Immigration Court during the thirteen-day interval that elapsed between the issuance of the OSC and the date of the shift in rules, and (2) the service of the OSC created an expectancy on his part that he would be eligible for suspension of deportation. Neither argument is persuasive.

Asserting an estoppel claim against the government is more easily said than done. The proponent must "demonstrat[e] that the traditional elements of an estoppel are present." Heckler v. Community Health Servs., 467 U.S. 51, 61 (1984). He also must "demonstrate that government agents have been guilty of affirmative misconduct." Dantran, Inc. v. United States

-17-

Dep't of Labor, 171 F.3d 58, 67 (1st Cir. 1999).  The upshot is that a private party who presses for an estoppel against the government must establish (1) the occurrence of affirmative government misconduct (2) engendering a reasonable (though erroneous) belief that a certain state of affairs exists (3) upon which the private party relies to his detriment.  See Akbarin v. INS, 669 F.2d 839, 842 (1st Cir. 1982).  Given the rigors of this gauntlet, it is not surprising that estoppel against the government — if it exists at all — is hen's-teeth rare.  OPM v. Richmond, 496 U.S. 414, 422 (1990) (noting that the Justices "have reversed every finding of estoppel [against the government] that [they] have reviewed"); United States v. Ven-Fuel, Inc., 758 F.2d 741, 761 (1st Cir. 1985) ("The possibility of harm to a private party inherent in denying equitable estoppel . . . is often (if not always) grossly outweighed by the pressing public interest in the enforcement of congressionally mandated public policy.").

The petitioner is unable to overcome these obstacles. First, he cannot meet the "affirmative misconduct" requirement because the INS has done nothing wrong in this case.  There is no set time either for initiating a deportation proceeding or for filing a served OSC.  Indeed, as we already have remarked, the INS has virtually unfettered discretion in such respects.

-18-

<u>American-Arab Anti-Discrimination Comm.</u>, 525 U.S. at 483-85.

Second, the petitioner has made no showing of detrimental reliance; because he had no right to call the tune as to when the INS would commence deportation proceedings against him, he cannot claim <u>reasonable</u> reliance on the import of the OSC (and, at any rate, he did not change his position because of it).[7] For these reasons, the petitioner's claim of equitable estoppel lacks force.

## III.

## Conclusion

---

[7]At the expense of carting coals to Newcastle, we add that, in order for there to be detrimental reliance, the aggrieved party must show that he has surrendered a right that he possessed. <u>Heckler</u>, 467 U.S. at 61-62. Here, however, the petitioner had no right to suspension of deportation. He had, at most, a hope of obtaining discretionary relief. <u>Gonzalez-Torres</u> v. <u>INS</u>, 213 F.3d 899, 903 (5th Cir. 2000) ("While petitioners may have expected that they would be eligible for suspension of deportation, IIRIRA's amendment limited only their eligibility for <u>discretionary</u> relief; it did not infringe on a <u>right</u> that they possessed prior to its enactment.") (emphasis in original); <u>Kolster</u> v. <u>INS</u>, 101 F.3d 785, 789 (1st Cir. 1996) (similar).

We need go no further.  Because the petitioner has offered us no sound basis for disturbing the BIA's decision, we deny his petition for review.

**<u>It is so ordered</u>**.