COMMONWEALTH vs. JUAN M. BAUTISTA.

Worcester. December 7, 2010. - April 11, 2011.

Present: IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.[1]

*Bail. Surety.*

Discussion of the contractual underpinnings of bail. [310-313]

A surety was not entitled under G. L. c. 276, § 70, to return of bail that he posted for the criminal defendant, based on representations that the defendant, immediately after his release from a house of correction, had been taken into the custody of the United States in connection with immigration proceedings against him, where the surety failed to carry his burden of proving that the defendant was rendered unavailable to appear because his removal had been compelled by an act of the United States government [313-316]; therefore, this court did not reach the question whether the defendant's failure to appear was without the surety's fault [316-317].

The failure of the Commonwealth to move for forfeiture of a criminal defendant's bail did not render a subsequent order of forfeiture improper, where the judge could order forfeiture sua sponte. [317]

INDICTMENTS found and returned in the Superior Court Department on April 17, 2008, and June 11, 2008, respectively.

A motion for return of bail was heard by *John S. McCann*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard J. Farrell, Jr.*, for Ernest Solomon.

*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. The appellant before the court, Ernest Solomon, served as the surety for Juan M. Bautista, the defendant in the underlying criminal cases, posting cash bail for the defendant. When the defendant did not appear in the Superior Court for a scheduled hearing approximately one month later, Solomon and the defendant's attorney represented to the Superior Court judge that on the posting of the bail, the defendant had been released

---

[1] Justice Cowin participated in the deliberation on this case prior to her retirement.

from the custody of the Worcester County sheriff and immediately taken into the custody of the United States in connection with immigration proceedings against him. We consider here whether, pursuant to G. L. c. 276, § 70, Solomon is entitled to exoneration as surety and to the return of the posted cash bail because "by the act of . . . the government of the United States" and "without [his] fault," he was unable to surrender the defendant. In the particular circumstances of this case, we conclude that Solomon is not entitled to exoneration and return of the bail, and affirm the order of the Superior Court.

1. *Facts and procedural history.* The defendant is a citizen of the Dominican Republic. In 2007 and again in 2008, the defendant, while living in Massachusetts, was charged in District Court complaints with various drug-related crimes in violation of G. L. c. 94C. Thereafter, a Worcester County grand jury indicted the defendant for the same offenses. He was arraigned in the Superior Court on one set of indictments on June 27, 2008, and arraigned in the same court on a second set of indictments on September 15, 2008. Bail was initially set at $10,000 cash, $100,000 surety, in each of the two Superior Court cases. The District Court complaints were dismissed in light of the superseding indictments.

In June of 2008, the defendant was being held in custody at the Worcester County jail and house of correction (house of correction) in connection with the District Court cases; he had not yet been arraigned in either Superior Court case. On June 19, 2008, the United States Department of Immigration and Customs Enforcement (ICE) issued a notice to appear (NTA) to the defendant, addressed to him at the house of correction. The NTA charged that the defendant, a citizen of the Dominican Republic, had been authorized to remain in the United States only until December 1, 2003, and was therefore required to appear and show why he should not be removed from the United States. The next day, June 20, the defendant confirmed on a written response form that he had received the NTA. He also checked off two boxes on the form, the first indicating, "I request a hearing before an immigration judge," and the second stating, "I admit that I am in the United States illegally, and I don't consider myself to be in any danger if I return to my country. I will denounce my right to a tribunal before an immigration judge. I want to return to my

country, and I understand that I . . . might be detained during that time before I leave."[2]

In January, 2009, a judge in the Superior Court reduced the bail in each of the defendant's two Superior Court cases from $10,000 to $5,000, on the condition that the defendant surrender his passport; the total cash bail set for both cases, therefore, was $10,000. The bail reduction order specified that the defendant's passport was to be surrendered and the bail paid at the "Superior Court only." Approximately three weeks later, on January 28 or 30,[3] Solomon posted the $10,000 cash bail for the two cases at the house of correction — not at the Superior Court. At that time, Solomon signed a form recognizance agreement or contract. Immediately above the signature line on this contract appears the following acknowledgment:

> "I, as surety, understand and acknowledge that if the above named defendant fails to appear and abide by all orders of the court . . . I will be liable, jointly and severally, with the defendant to the Commonwealth of Massachusetts for the dollar amount specified in the terms of the release."

Within one week of posting the defendant's bail, on February 3, 2009, Solomon filed a motion for its return in the Superior Court. There was no matter scheduled in the defendant's cases for February 3, and therefore there was no requirement that the defendant be in court that day. The Superior Court judge to whom Solomon's motions were presented (who was not one of the judges who had set bail for the defendant) took no action on the motions at that time, but held them for further hearing on March 2, the scheduled date for trial assignment in the defendant's cases.[4] On March 2, Solomon and the attorney representing the defendant in the two cases both appeared in the Superior

---

[2]The form that the defendant checked and signed is in Spanish. This English translation quoted in the text was provided orally by Ernest Solomon, the surety, who is bilingual in Spanish and in English, when he appeared before a Superior Court judge on February 3, 2009. See *infra.*

[3]The judge found the date was January 30, 2009, which is the date listed on the Superior Court dockets, but the recognizance form that reflects the payment of the cash bail is dated January 28, 2009. The discrepancy in the dates is not material to this case.

[4]Solomon filed two documents entitled "motion for return of cash deposited

Court, but the defendant did not. After a hearing, the judge ordered the defendant's bail forfeited. Thereafter, on April 3, 2009, the judge held a further hearing — attended by Solomon and the defendant's attorney but not by the defendant — at which time the judge ordered that the defendant be defaulted nunc pro tunc to March 2, 2009, the earlier trial assignment date. On April 23, the judge issued his written findings and rulings.

The judge found the following, based on the representations of Solomon and the attorney.[5] Solomon is an attorney, but he did not represent the defendant in the two criminal cases at issue. Approximately $8,000 of the $10,000 cash bail were Solomon's funds, with the remainder belonging to a "community group." Solomon, who speaks Spanish, had come to know the defendant's family through work Solomon did in the Hispanic community. At the time he posted the bail in January of 2009, Solomon knew that as of June 20, 2008, ICE had "lodged its detainer[6] at the Worcester County House of Correction"; and that the defendant had acknowledged on the NTA form that he was in the United States illegally, that he intended to return to the Dominican Republic, and had waived his right to a hearing before a tribunal.[7] Although Solomon stated that he had thought ICE would release the defendant on its "detainer," and not deport him, instead — again according to the defendant's attorney and Solomon — when the bail was posted, the defendant

with the court as bail," but the judge treated one as a motion and the other as Solomon's affidavit in support of the motion. The judge also concluded that the motion applied to both cases.

[5]Neither the defendant's attorney nor Solomon filed any affidavit or other paper in support of their oral representations concerning the whereabouts or status of the defendant after Solomon posted bail. Nor, does it appear, that either of them testified under oath as a witness at any of the hearings on Solomon's motions for return of bail.

[6]The record contains no detainer form. The judge appears to have mistaken the notice to appear (NTA), authorized under 8 U.S.C. § 1229(a)(1) (2006), for a detainer authorized pursuant to 8 U.S.C. § 1357(d) (2006).

[7]As previously indicated, the defendant checked two boxes on the NTA response form, the first indicating that he requested a hearing before an immigration judge, and the second stating that he waived his right to appear before a tribunal. Although these two boxes appear at first blush to set forth alternative, and inconsistent, requests, the judge interpreted the defendant's response on the form to be a waiver of his right to a hearing and an effective agreement to be deported; Solomon does not challenge this interpretation. We accept it as well.

was not released, but was taken immediately into the custody of ICE and allegedly transferred to Texas, and either had been deported at the time of the March 2, 2009, hearing, or would be deported soon.

Based on these "facts," the judge made the following ultimate findings: "that (1) Solomon knew, or should have known of [the defendant's] voluntary surrender to ICE; (2) that [the defendant's] failure to appear due to deportation proceedings was [the defendant's] own fault; (3) that the actions of [the defendant] clearly suggest an intent to evade prosecution by subjecting himself to deportation proceedings prior to his trial on the state criminal charges; and (4) that Solomon has not met his burden to establish[] that the interests of justice warrant remission of the bail to Solomon where [the defendant] has voluntarily surrendered to immigration authorities in order to be deported to his home country." Stating that he was exercising his discretion, the judge ruled that "Solomon, the surety, assumed the risk that the bail would be subject to forfeiture," denied Solomon's motion for return of bail, and repeated his earlier order of forfeiture. Solomon filed a timely appeal from the judge's order, and we transferred the case from the Appeals Court on our own motion.

2. *Discussion.* a. *General background.* There is no dispute that the defendant failed to appear in the Superior Court when he was obligated to do so. As a general rule, when a defendant who is charged with a crime and "under recognizance" fails to appear, "his default shall be recorded, his obligation *and that of his sureties forfeited*" (emphasis supplied). G. L. c. 276, § 71. Solomon claims, however, that this general rule does not apply in the factual circumstances of this case, because under G. L. c. 276, § 70 (§ 70), he is entitled to be "exonerated and discharged" from his obligation as surety, and to the return of the cash bail that he posted.

Section 70 provides:

> "If, by the act of God, of the government of the United States, of any state or by sentence of law, bail are unable without their fault to surrender their principal, they shall, upon motion before final judgment on scire facias,[8] be

---

[8] A "scire facias" is "[a] writ requiring the person against whom it is issued

exonerated and discharged by the court, with or without costs as the court deems equitable."[9]

Section 70 was enacted more than 150 years ago, see St. 1859, c. 131, but it does not appear to have been interpreted by this or any other court. In order to determine its meaning, we look "to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Industrial Fin. Corp.* v. *State Tax Comm'n,* 367 Mass. 360, 364 (1975), quoting *Hanlon* v. *Rollins,* 286 Mass. 444, 447 (1934). To provide context for this inquiry, it is helpful to review briefly some of the relevant principles that historically have governed the administration of a system of bail in the Commonwealth.

"A court admits a defendant to bail in order to assure the defendant's appearances in court. Simultaneously, the court permits the defendant to enjoy freedom from confinement while he awaits disposition of his case." *Commonwealth* v. *Stuyvesant Ins. Co.,* 366 Mass. 611, 614 (1975). In posting bail for the principal, the surety in effect "guarantees that the principal will appear and answer." *Id.* It is on account of this guarantee that if the surety "fails to produce its principal at the appointed time, a default will be entered against the principal and surety and the principal's obligation and that of his surety will be forfeited." *Id.,* citing G. L. c. 276, § 71.

---

to appear and show cause why some matter of record should not be annulled or vacated, or why a dormant judgment against that person should not be revived." Black's Law Dictionary 1464 (9th ed. 2009). See note 11, *infra.*

[9]Although G. L. c. 276, § 70 (§ 70), was first enacted in 1859, its language essentially has remained unchanged. As used in § 70, the word "bail" refers to parties who post the required amount of cash or security to secure the release of a "principal" — now commonly referred to as the surety. The term "principal" refers to a defendant who has been arrested and is released from custody pending a scheduled court appearance. See *Commonwealth* v. *Cabral,* 443 Mass. 171, 172 n.3 (2005). In the present case, we use the term "surety" to refer to Solomon, and the term "bail" to refer to the monetary security itself in our discussion. See Black's Law Dictionary 160, 1579 (9th ed. 2009). However, as we think will be clear from the context, a number of the older decisions of this court that are quoted in this opinion use the word "bail" to refer to the person or persons whom we have called the "surety."

"The right to be bailed in certain cases is as old as the law of England itself . . . ." *Querubin* v. *Commonwealth*, 440 Mass. 108, 113 (2003), quoting 1 Stephen, History of the Criminal Law of England 233 (1883). See *Commonwealth* v. *Baker*, 343 Mass. 162, 165-168 (1961) (discussing history of bail in Massachusetts). Massachusetts has long followed the common-law rule allowing the courts discretionary power in granting bail. *Querubin* v. *Commonwealth, supra* at 113-114, citing L.B. Orfield, Criminal Procedure from Arrest to Appeal 104, 108 (1947). The courts also have long enjoyed discretion with respect to the remission of forfeited bail. See G. L. c. 276, § 74.[10]

Consistent with the bail statutes, the common law, too, evolved with a recognition of the contractual underpinnings of bail and of the appropriateness of recognizing limited exceptions to the general rule of bail forfeiture whenever a defendant fails to appear and answer the charges against him. See, e.g., *Harrington* v. *Dennie*, 13 Mass. 93, 94 (1816), where the court stated: "Now it is a common principle, that, when a man is bound to perform a contract, which becomes impossible by the act of God, or unlawful by statute, after the making of the contract, he is excused from the performance; and may plead such matter in excuse, when sued upon his contract. This course of reasoning, however, applies to cases in which, by some involuntary privilege or disability happening to the principal, the bail are deprived of the custody of his person; so that he cannot be surrendered . . . ." In *Way* v. *Wright*, 5 Met. 380, 383 (1843), the court described particular circumstances that would support a surety's claim that he be excused from performance, including the possibility that an act of government might be sufficient: "Bail are excused from surrendering the principal, by the act of the law, as where the debt is discharged by a certificate of bankruptcy. And so by the act of the government; as where an alien, who has been held to bail, is sent out of the realm, or a seaman is impressed into the government service." Then, in 1854, the

[10]In discussing St. 1810, c. 80 (now codified at G. L. c. 276, § 74), not long after its enactment, this court observed that the statute "was plainly intended for cases of unavoidable accident, or irresistible necessity, and for the relief of unfortunate persons who are induced by humane feelings to become sureties for persons who afterwards abscond, leaving their bail without indemnity or remedy." *Commonwealth* v. *Dana*, 14 Mass. 65, 65 (1817).

court explained: "As to bail, 'wherever the principal by act of God, or of the law, is taken, as it were, out of the bail's keeping, before the day of surrender allowed, and without fault in his bail, they are discharged.' " *Fuller* v. *Davis*, 1 Gray 612, 613 (1854), quoting 5 Dane's Abridgement 290 (noting this "one general principle" applies in England as well).

Section 70, enacted five years after the decision in *Fuller* v. *Davis, supra,* incorporates much of the substance, if not the specific language, of this court's decisions that we have just quoted. In interpreting § 70, we are guided, therefore, by the common-law principles relating to bail that our earlier cases had expounded, in addition to the language of the statute itself. See *Commonwealth* v. *Cabral*, 443 Mass. 171, 175-177 (2005) (examining common law to interpret G. L. c. 276, §§ 68 and 69, concerning surety's right to surrender principal).

We turn now to Solomon's argument that § 70 entitles him to recover the bail money he posted for the defendant.

b. *An act of the government of the United States.* By its terms, § 70 entitles a surety to the return of posted bail if two conditions are met: (1) one of the four circumstances or events listed in the first clause of the section has occurred; and (2) the surety is "without . . . fault." As the surety who contractually "guarantee[d]" the defendant's appearance in the Superior Court, *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. at 614, Solomon had the burden to prove that each of these conditions was met. See 30 S. Williston, Contracts § 77:51 (4th ed. 2004) ("As with other defenses generally, the burden of establishing the nature, extent and causative effect of the alleged impracticability is invariably held to be upon the party asserting it"). See also *Chase Precast Corp.* v. *John J. Paonessa Co.*, 409 Mass. 371, 373 (1991) (doctrine of impossibility is defense to action for breach of contract).[11]

The first point of inquiry, therefore, is whether Solomon established that failure to produce the defendant was because of

---

[11]Section 70 itself provides that bail will be "exonerated and discharged" on "motion before final judgment on scire facias." As its definition reflects, see note 8, *supra,* that quite ancient writ required the surety "to appear and show cause" and thus to defend against enforcement of the writ seeking forfeiture of the bail. See *Way* v. *Wright*, 5 Met. 380, 383 (1843); *Harrington* v. *Dennie*, 13 Mass. 93, 93-94 (1816); *Sayward* v. *Conant*, 11 Mass. 146 (1814).

an "act of God, of the government of the United States, of any state or by sentence of law" — the four events described in § 70. Solomon argues that the defendant was not able to appear in the Superior Court when required because of an action of the United States government within the meaning of § 70, namely, Solomon states, the defendant's "being in [F]ederal custody awaiting deportation proceedings." As we have indicated, we interpret § 70 in light of decisions of this court discussing common-law principles that predated the enactment of § 70. Those early cases demonstrate that historically, for a governmental act to qualify as a reason for the exoneration of a surety, the act must have been beyond the control of the defendant (principal) himself; it could not be an act that the principal volunteered to perform. See, e.g., *Harrington* v. *Dennie*, 13 Mass. at 94 ("To admit that a principal, by a voluntary assumption of a duty or office which may exempt him from arrest, may defeat [the bail-bond] contract, or enable his surety to do it, without the consent of the party interested, would be to violate the common principles of justice, as well as the faith of engagements");[12] *Sayward* v. *Conant*, 11 Mass. 146 (1814) (principal's voluntary enlistment in army insufficient to discharge surety from bail obligation). See also *Lamphire* v. *State*, 73 N.H. 463, 464 (1906) (where principal voluntarily enlisted, "his absence is due to his voluntary act, and not, as far as appears, to any act of the government of the United States").[13] Contrast *Way* v. *Wright*, 5 Met. 380, 383 (1843) ("Bail are excused from surrendering the principal . . .

[12]The court went on to explain its reasoning: "The bail [surety] repose[s] confidence in the debtor; the creditor does not. The hazard of avoidance, either by absconding or by assuming an office which secures him from arrest, belongs to the bail, and not to the creditor." *Harrington* v. *Dennie*, 13 Mass. 93, 94 (1816).

[13]New Hampshire has a bail statute that appeared in a statutory compilation as early as 1867, and that has provisions remarkably similar to G. L. c. 276, § 70. See N.H. Rev. Stat. § 597:30 (West 2001) ("When the sureties in a recognizance, without their fault, are prevented from surrendering their principal by an act of God or of the government of the state or of the United States, or by sentence of law, the superior court, on petition and notice thereof to the county commissioners and state's counsel, may discharge them on such terms as may be deemed just"). The New Hampshire statute was in fact derived from the same common ground as the 1860 compilation of Massachusetts statutes in which the 1859 version of § 70 appeared. See N.H. Gen. Stat. c. 241, § 12 (1867), citing Gen. St. 1860 c. 170, § 43. In the case cited in the

by the act of the government; as where an alien, who has been held to bail, is sent out of the realm, or a seaman is impressed into the government service"). We interpret § 70 in accord with these decisions, concluding that "an act of the government of the United States" is limited to an act that compels the removal of the defendant, and does not include a removal brought about because the defendant volunteered to go.

The record in this case indicates that Solomon has not carried his burden of proving that the defendant was rendered unavailable to appear because his removal had been compelled by an act of the United States government. The only evidence presented to the judge that the defendant had been taken into custody by ICE consisted of representations made by the defendant's attorney and by Solomon himself that the defendant *may* have been transferred to Texas or deported to the Dominican Republic — representations that were not supported by documentation or by affidavit of either Solomon or the defendant's attorney. Even accepting the two attorneys' unsupported representations as true, Solomon has presented insufficient evidence of a governmental command beyond the defendant's control that prevented him from appearing. When the United States Department of Homeland Security served the defendant with the NTA, the effect was only to initiate charges against the defendant based on his immigration status. See 8 U.S.C. §§ 1229, 1229a (2006). There is nothing in the record indicating that the document was ever filed with the Immigration Court. See 8 C.F.R. §§ 1003.13, 1003.14 (2010) (proceedings before immigration judge commence when "charging document," such as NTA, is filed with Immigration Court). See also *Hakim* v. *Holder*, 611 F.3d 73, 75 (1st Cir. 2010) ("the Department of Homeland Security . . . commenced removal proceedings against Hakim by filing a [NTA] with the Immigration Court"); *Costa* v. *Immigration & Naturalization Serv.*, 233 F.3d 31, 37 (1st Cir. 2000) (upholding board of immigration appeals determination that petitioner was not in deportation proceedings until notice to appear was filed with Immigration Court). Moreover, the NTA itself indicates that the

text, *Lamphire* v. *State*, 73 N.H. 463 (1906), the court was interpreting and applying this New Hampshire bail statute, by then codified at Pub. St. 1901, c. 252, § 30.

defendant was being ordered to appear before an immigration judge on some future date and time not yet determined. On this record, we have no way of knowing whether, still assuming that ICE took immediate custody of the defendant on his release on bail, it did so only because the defendant had checked the box indicating that he admitted he was in the United States illegally, did not seek a hearing before a tribunal concerning his right to stay here, and wanted to return to his country.[14] Cf. *Commonwealth* v. *Al Saud, ante* 221, 231-233 (2011) (defendant's post-conviction, negotiated "voluntary departure" from United States while on parole neither rendered impossible nor excused defendant's failure to report to probation department on release from house of correction). From Solomon's perspective, at best the record presents an unanswered question whether the defendant's absence was compelled; unanswered questions do not satisfy the burden of proof.

c. *Without the surety's "fault."* Because Solomon has failed to demonstrate that an act "of the government of the United States" within the meaning of § 70 caused the defendant's failure to appear, we do not need to decide whether Solomon proved that this nonappearance was "without [his] fault" as surety. G. L. c. 276, § 70. We make one observation, however, with respect to the judge's statement of fault in this context. Solomon argues that the judge erred in ruling that "because [the defendant's] immigration status and the chance that he would be deported were known to Solomon, . . . Solomon assumed the risk that [the defendant] would be deported." To the extent the ruling means that Solomon "assumed the risk" solely because [the defendant] was a noncitizen for whom there was a potential of deportation, it was erroneous. It is not the case that just because a defendant in a criminal case is a noncitizen and a potential for deportation therefore exists, a surety assumes the risk of that defendant's nonappearance on account of deportation, and will never be entitled to exoneration and recovery of funds that the surety may have posted as bail if the defendant is

---

[14]The parties have offered no explanation of the meaning or effect of the immigration forms included in the record, which only contributes to the uncertainty that exists concerning the defendant's status at the time Solomon was seeking return of the bail money.

indeed deported before the final resolution of the criminal case.[15] Every case must be decided on its specific facts.

d. *Improper order of bail forfeiture.* Solomon contends that the judge's order of bail forfeiture was improper because the Commonwealth made no motion for its forfeiture. He points to *Commonwealth* v. *Stuyvesant Ins. Co.*, 366 Mass. at 614-615, where the court explained, citing G. L. c. 12, § 28, that "[a]fter the default has been entered, the Commonwealth must initiate proceedings to obtain a judgment on the forfeiture of the bonds." Solomon further argues that G. L. c. 276, § 74, sets out the procedure by which bail may be forfeited, and requires the "filing in the case of a certificate of the district attorney or prosecuting officer stating that the interests of justice would be furthered thereby and setting forth specifically the reasons therefor." It is true that one way in which an order of bail forfeiture may enter is on a motion by the Commonwealth. See G. L. c. 12, § 28 ("District attorneys shall commence suits upon recognizances in criminal cases within their respective districts within sixty days after default has been entered of record, or after they have satisfactory evidence of an act which would cause a forfeiture thereof, and shall prosecute them without delay"); G. L. c. 276, § 71 ("his default shall be recorded, his obligation and that of his sureties forfeited, and process issued against them . . . as the prosecuting officer directs"). It is equally clear, however, that none of the provisions cited by Solomon preclude a court from ordering forfeiture of bail on its own. See G. L. c. 276, § 80, which states in relevant part: "At any time after default of the defendant, the court may order forfeited the money, bonds or bank books deposited at the time of the recognizance and the court or clerk of the court with whom the deposit was made shall thereupon pay to the state treasurer any money so deposited. . . ." The order of bail forfeiture in this case was proper.

3. *Conclusion.* Solomon failed to meet his burden as surety to

---

[15]At the same time, it may well be that a judge properly could conclude that a surety is not "without . . . fault" where the surety posts bail for a defendant whom the surety knows is the subject of a detainer issued and lodged by ICE, and that defendant thereafter fails to appear in the case because ICE took immediate custody of him on his release on bail.

establish that an act of the United States government prevented the defendant from appearing in the Superior Court to answer the criminal charges against him. Solomon therefore is not entitled to exoneration of bail under G. L. c. 276, § 70.

The judge's order denying Solomon's motion for the return of bail is affirmed.

*So ordered.*