[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12578

_____

Agency No. A206-459-138

DARVIN DANIEL PEREZ-SANCHEZ,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 21, 2019)

Before MARTIN, ROSENBAUM, and BOGGS,[*] Circuit Judges.

MARTIN, Circuit Judge:

_____

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Darvin Perez-Sanchez's case sits at a familiar crossroad in immigration law, where personal hardship intersects with technical administrative and statutory requirements.  Among other issues, his petition for review asks us to consider the effect of the Supreme Court's decision in Pereira v. Sessions, 585 U.S. __, 138 S. Ct. 2105 (2018).  Pereira interpreted 8 U.S.C. § 1229(a)(1), the provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") defining a Notice to Appear ("NTA").  138 S. Ct. at 2113–16.  Mr. Perez-Sanchez argues the immigration judge ("IJ") never had jurisdiction over his removal case because the Department of Homeland Security ("DHS") issued him an NTA that did not include either the time or date of his removal hearing.  He relies on Pereira, which held in a different context that § 1229(a)(1) requires this information.  Id. at 2113–14.  DHS insists in response that the agency properly exercised jurisdiction since the jurisdictional rule in question was established by regulation, not by statute, and Mr. Perez-Sanchez's NTA complied with the regulations.  See 8 C.F.R. § 1003.15(b)–(c).

Because Congress alone has the power to define the scope of an agency's authority, we join several of our sister circuits and hold today that the regulations set forth a claim-processing rule as opposed to a jurisdictional one.  We recognize § 1229(a)(1) as setting out a claim processing rule as well.  We therefore deny Mr.

Perez-Sanchez's petition for review as to this claim because the deficient NTA did not deprive the agency of jurisdiction over his removal proceedings.

We do not, however, accept the agency's analysis of Mr. Perez-Sanchez's asylum and withholding claims. The Board of Immigration Appeals ("BIA") affirmed the IJ's denial of both claims, saying that Mr. Perez-Sanchez's relationship to his father-in-law was not a central reason for his persecution at the hands of the Gulf Cartel. This conclusion cannot be squared with the record evidence. We therefore grant Mr. Perez-Sanchez's petition for review and remand his asylum and withholding of removal claims for further proceedings consistent with this opinion.

## I.

The Gulf Cartel is one of Mexico's oldest and most dangerous cartels. On December 21, 2013, five of its members broke into Mr. Perez-Sanchez's house in Tapachula, Mexico and held him at gunpoint.[1] They told him they were there to collect on a debt the cartel believed he owed. Some years before, a man nicknamed "El Banana" lost a shipment containing 500 kilograms of cocaine that belonged to the cartel. The cartel never forgot the loss. When its members could

---

[1] Our recitation of the factual background draws heavily from Mr. Perez-Sanchez's testimony before the IJ. Because the BIA neither adopted nor addressed the IJ's credibility determination, this Court must assume Mr. Perez-Sanchez was credible. See Sandie v. Att'y Gen. of U.S., 562 F.3d 246, 252 (3d Cir. 2009) ("[W]e must assume Sandie's testimony is credible because we have no credibility determination to review from the BIA.").

not find El Banana, they tracked down his daughter and her partner for information and, failing that, repayment. By the time the cartel broke into Mr. Perez-Sanchez's house, the members knew something he did not: namely, that El Banana was Perez-Sanchez's father-in-law, Elias Gamaliel Martinez-Carasco.

Determined to make their trip worthwhile, the cartel members demanded Mr. Perez-Sanchez reveal his father-in-law's whereabouts. But Mr. Perez-Sanchez had no idea where Mr. Martinez-Carasco was. Because Mr. Martinez-Carasco abandoned his daughter, Sandra Gabriela Martinez Reyes, at a young age, neither she nor Mr. Perez-Sanchez knew much about the man, much less that he had been involved in the Gulf Cartel's drug trafficking operations. The cartel, however, was unmoved by Mr. Perez-Sanchez's pleas of ignorance. With each unsatisfactory answer, the cartel members beat Mr. Perez-Sanchez, fracturing his collarbone and at least one of his ribs. They also warned him that anyone caught stealing from or snitching on them would "have their hands chopped off or blown off and . . . their heads blown off."

Eventually, one of the cartel members proposed that Mr. Perez-Sanchez use his banking job to help the cartel set up fake accounts. The cartel knew that Mr. Perez-Sanchez was a college graduate who was currently working for a bank handling credit card payments. The cartel explained that because Mr. Perez-Sanchez's father-in-law owed them money, Perez-Sanchez did as well. Scared of

4

losing the license he'd worked so hard to earn, Mr. Perez-Sanchez refused to help the Gulf Cartel set up fake accounts. The cartel members then ransacked Mr. Perez-Sanchez's house, where they stumbled upon a box containing 46,000 pesos in the bedroom. Again, the cartel directed Mr. Perez-Sanchez to assist them. And again, Mr. Perez-Sanchez refused, telling them that he had "no reason to pay [the] debt of another person."

Fed up with his continued resistance, the most violent member of the group grabbed Mr. Perez-Sanchez by the shirt, put a gun to his head, and told him to pray because his time had come. Mr. Perez-Sanchez's life was spared at the last second only when another cartel member seized on the idea that Perez-Sanchez could repay his father-in-law's debts with money. This idea was born from the 46,000 pesos found in the Perez-Sanchez home.

The cartel then made Mr. Perez-Sanchez one final offer: in exchange for the 46,000 pesos (which the cartel would credit toward an interest payment on his father-in-law's debt) and a monthly payment of 26,000 pesos, the cartel would stay its hand. This time, Mr. Perez-Sanchez accepted. The cartel members then left, with one driving off in a Mexican police car. Some time later, Ms. Reyes arrived home with a friend, where they discovered Mr. Perez-Sanchez on the ground, bleeding and badly beaten. They immediately took him to the hospital for treatment.

5

True to his word, Mr. Perez-Sanchez paid the cartel 26,000 pesos every month afterward by showing up at the designated park with a fanny pack full of money. But the payments were taking their toll. Prior to the couple's encounter with the cartel, Mr. Perez-Sanchez and Ms. Reyes lived relatively comfortable lives. Between their environmental consulting business and Mr. Perez-Sanchez's banking job, the couple did not want for money. The extortion payments changed everything. Just four months into the payment plan, Mr. Perez-Sanchez ran out of money. When the couple was not able to make their May 2014 payment, they fled to the United States. They never finished paying off Mr. Martinez-Carasco's debt.

Mr. Perez-Sanchez and Ms. Reyes arrived in the United States on May 27, 2014. DHS began removal proceedings against Mr. Perez-Sanchez on June 9, 2014 and served him with an NTA ordering him to appear before an IJ in Eloy, Arizona at a date and time "to be set." Proceedings were eventually transferred to Florida, where Mr. Perez-Sanchez applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

Following two hearings, during which Mr. Perez-Sanchez and Ms. Reyes testified about their experiences with the Gulf Cartel, the IJ denied Perez-Sanchez all relief. The IJ found that although "[t]he cartel's motive to increase its profits and obtain repayment for the [father-in-law's] debt was one central reason for its actions against [Mr. Perez-Sanchez] and [Ms. Reyes]," any motive to harm Perez-

6

Sanchez based on his relationship to Mr. Martinez-Carasco "was, at most, incidental." The IJ concluded that because Mr. Perez-Sanchez failed to show he suffered persecution "on account of a protected ground," he was ineligible for asylum and withholding of removal.[2] The IJ then ordered Mr. Perez-Sanchez removed to Mexico.

Mr. Perez-Sanchez appealed the IJ's decision to the BIA, which dismissed the appeal on May 21, 2018 without briefing by DHS. Although the BIA acknowledged at the outset that "the issue of nexus [was] close," because Mr. Perez-Sanchez's "relationship to his father-in-law [was] a reason for the harm and extortion he experienced," the BIA nonetheless agreed with the IJ that the family relationship was not a central reason for Perez-Sanchez's suffering. The BIA did not consider the IJ's twin findings that the Gulf Cartel targeted Mr. Perez-Sanchez to "recuperate[] money owed by [his] father-in-law" and that "any motive to harm [Perez-Sanchez] based on his family status was at most incidental" to be clearly erroneous.

Mr. Perez-Sanchez timely petitioned this Court for review.

---

[2] The IJ also denied Mr. Perez-Sanchez's CAT claim for reasons unrelated to this petition for review.

## II.

"We review questions of statutory interpretation and other issues of law de novo," De Sandoval v. U.S. Att'y Gen., 440 F.3d 1276, 1278 (11th Cir. 2006), deferring to an agency's interpretation of a statute it administers only if the statute's language is ambiguous and the agency's interpretation is "based on a permissible construction of the statute," id. at 1279 (quoting Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 (1984)). We review factual determinations by the agency for substantial evidence. Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1230–31 (11th Cir. 2006) (per curiam). Under substantial evidence review, reversal is warranted only if "the evidence compels a reasonable fact finder to find otherwise." Id. at 1231 (quotation marks omitted).

## III.

We begin with Mr. Perez-Sanchez's argument that DHS's failure to include the time and date of his removal hearing in his NTA means the agency did not have jurisdiction over his removal proceedings. Under BIA regulations, "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court." 8 C.F.R. § 1003.14(a). For proceedings initiated after April 1, 1997, an NTA is one type of charging document. Id. § 1003.13. Mr. Perez-Sanchez argues that the "Notice to Appear" mentioned in the regulations carries the same meaning as the "Notice to

Appear" defined in the statute, 8 U.S.C. § 1229(a).  In addition, he says the Supreme Court's decision in Pereira, which addressed 8 U.S.C. § 1229(a), held an NTA must include the time, date, and location of the removal hearing.  Putting these two arguments together, Mr. Perez-Sanchez asserts that an NTA lacking the time, date, or location of a removal hearing necessarily fails to vest the IJ with jurisdiction over removal proceedings.

But this argument presupposes the jurisdictional nature of the regulation in question, 8 C.F.R. § 1003.14(a).  As we will explain, both the regulation and the statute set forth only claim-processing rules with respect to the service or filing of an NTA.  For this reason, we conclude Mr. Perez-Sanchez is not entitled to a remand on this claim.

## A.

First, a word on jurisdiction and exhaustion.  Because Pereira was issued one month after the BIA dismissed his appeal, Mr. Perez-Sanchez never had the opportunity to raise this claim before the agency.  Ordinarily, a petitioner's failure to exhaust a claim before the BIA deprives our Court of jurisdiction over that claim.  See Jeune v. U.S. Att'y Gen., 810 F.3d 792, 800 (11th Cir. 2016).  But we are not deprived of jurisdiction here.  We always "have jurisdiction to determine our own jurisdiction."  Patel v. U.S. Att'y Gen., 334 F.3d 1259, 1262 (11th Cir. 2003).  And our jurisdiction to review removal proceedings extends only to final

orders of removal.  See 8 U.S.C. § 1252(a)(1), (b)(9).  If, as Mr. Perez-Sanchez argues, the agency never had jurisdiction over his removal proceedings to begin with, the entire proceeding—including the final order of removal—would be invalid, and we would have no jurisdiction to entertain his petition.  We therefore cannot remand this question for the BIA to address in the first instance.  See Hernandez-Perez v. Whitaker, 911 F.3d 305, 310–11 (6th Cir. 2018) (addressing the petitioner's abandoned Pereira claim because it pertained "to a possible jurisdictional flaw").  We must determine for ourselves whether Mr. Perez-Sanchez's removal proceedings resulted in a valid final order of removal.

Having established our jurisdiction to review Mr. Perez-Sanchez's Pereira claim, we turn now to its substance.

**B.**

As with all matters of statutory and regulatory interpretation, our inquiry into the scope of the agency's jurisdiction begins with the statute itself.  See Chevron, 467 U.S. at 842–44, 104 S. Ct. at 2781–82.  Here, the relevant statutory provision, 8 U.S.C. § 1229, titled "[i]nitiation of removal proceedings," states that "[i]n removal proceedings under section 1229a . . . , written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien . . . specifying the following: . . . [t]he time and place at which the proceedings will be held."  8 U.S.C. § 1229(a)(1).  The statute thus clearly requires that an NTA

10

include the time and place of a noncitizen's removal proceedings.  As the Supreme Court explained in Pereira, section 1229(a) "speak[s] in definitional terms, at least with respect to the time and place at which the proceedings will be held."  138 S. Ct. at 2116 (quotation marks omitted).  For this reason, Mr. Perez-Sanchez's NTA was unquestionably deficient under the statute—although his NTA listed the location, it left off both the time and date of the hearing.

The government nonetheless urges this Court to defer to the BIA's interpretation that an NTA under section 1229(a) is not deficient so long as a subsequent notice of hearing is later sent and specifies the time and location of the removal hearing.  In re Bermudez-Cota, 27 I. & N. Dec. 441, 447 (BIA 2018).  But the Supreme Court foreclosed this argument in Pereira.  There, the Court held an NTA that fails to specify the time and place of removal proceedings is defective. Pereira, 138 S. Ct. at 2116.  The omission of that information, as the Supreme Court saw it, was not "some trivial, ministerial defect" that could be cured later. Id.  Rather, "[f]ail[ure] to specify integral information like the time and place of removal proceedings unquestionably would deprive the notice to appear of its essential character."  Id. at 2116–17 (alteration adopted, emphasis added, and quotation marks omitted).  And because Congress's intent was clear from the face of the statute, that was the end of the matter for the Court.  Id. at 2113 (citing Chevron, 467 U.S. at 842–43, 104 S. Ct. at 2781).  Under Pereira, then, a notice of

11

hearing sent later might be relevant to a harmlessness inquiry, but it does not render the original NTA non-deficient.  Cf. Ortiz-Santiago v. Barr, 924 F.3d 956, 962 (7th Cir. 2019) (declining to defer to Bermudez-Cota because the decision "brushed too quickly over the Supreme Court's rationale in Pereira").

However, our conclusion that the NTA was deficient does not mean the agency lacked jurisdiction over Mr. Perez-Sanchez's case.  We do not read section 1229's time-and-place requirement to create a jurisdictional rule.  See Henderson v. United States, 517 U.S. 654, 656, 116 S. Ct. 1638, 1640 (1996) ("[T]he manner and timing of serving process are generally nonjurisdictional matters of 'procedure.'").  Notably, neither party argues otherwise.

The parties instead focus their attention on 8 C.F.R. § 1003.14, a regulation that purportedly sets forth the agency's jurisdiction over removal proceedings and ties the commencement of those proceedings to the filing of an NTA "with the Immigration Court" as opposed to the service of an NTA upon a noncitizen, 8 U.S.C. § 1229(a).  The parties make two assumptions by focusing on the regulation: first, that 8 U.S.C. § 1229(a) is ambiguous with respect to the point of commencement for removal proceedings, such that the agency could promulgate a regulation establishing the filing of an NTA as the point of commencement; and second, that the agency was empowered to promulgate a regulation restricting its jurisdiction over removal proceedings.  We will address each assumption in turn.

12

With respect to the first, Congress's decision to nest "service" of an NTA under "[i]nitiation of removal proceedings" suggests to us that Congress intended for <u>service</u> of an NTA—not filing—to operate as the point of commencement for removal proceedings.[3] If that were indeed the case, the agency was not free to redefine the point of commencement and our inquiry should end with the statute. <u>Chevron</u>, 467 U.S. at 842–43, 104 S. Ct. at 2781 ("If the intent of Congress is clear, . . . the agency[] must give effect to the unambiguously expressed intent of Congress."). Nonetheless, even if we assume for purposes of this opinion that the statute is ambiguous and the regulation should be given effect, the outcome remains the same. This is because 8 C.F.R. § 1003.14, like 8 U.S.C. § 1229(a), sets forth only a claim-processing rule. And this brings us to the parties' second assumption—namely, that 8 C.F.R. § 1003.14 established a jurisdictional rule.

We do not fault the parties for this assumption. After all, section 1003.14 specifically states "[j]urisdiction vests, and proceedings before an Immigration

---

[3] We are aware that several of our sister circuits have deferred to the regulations when assessing the date of commencement. <u>See, e.g.</u>, <u>DiPeppe v. Quarantillo</u>, 337 F.3d 326, 334 (3d Cir. 2003) ("Although DiPeppe was served with an [Order to Show Cause] and Notice of Hearing in 1992, removal proceedings did not effectively commence for her until 2000, when the NTA was filed with the Immigration Court."); <u>DeLeon-Holguin v. Ashcroft</u>, 253 F.3d 811, 814–15 (5th Cir. 2001) ("We therefore hold that removal proceedings commence when the [Immigration and Naturalization Service] files the appropriate charging document with the immigration court."); <u>Costa v. I.N.S.</u>, 233 F.3d 31, 36–37 (1st Cir. 2000) (applying <u>Chevron</u> deference to conclude that the "petitioner was not in deportation proceedings until the NTA was filed with the Immigration Court"). But it does not appear that any of them considered whether 8 U.S.C. § 1229(a) was unambiguous with respect to the date of commencement.

13

Judge commence, when a charging document is filed with the Immigration Court by the Service." A charging document, in turn, refers to "the written instrument which initiates a proceeding before an Immigration Judge," such as a "Notice to Appear." Id. § 1003.13. And in contrast to their statutory counterpart, the regulations do not require that an NTA contain the time, date, and location of the removal hearing. See id. §§ 1003.15, 1003.18.

Many of our sister circuits have accepted the proposition that 8 C.F.R. § 1003.14 sets forth a jurisdictional rule. See, e.g., Nkomo v. Att'y Gen. of U.S., 930 F.3d 129, 133 (3d Cir. 2019) (referring to the regulation as "jurisdiction-vesting"); Banegas Gomez v. Barr, 922 F.3d 101, 111 (2d Cir. 2019) ("The Attorney General has promulgated regulations governing removal proceedings that do address when jurisdiction vests in the Immigration Court."); Ali v. Barr, 924 F.3d 983, 986 (8th Cir. 2019) ("As our sister circuits have explained, § 1229(a) says nothing about how jurisdiction vests in an immigration court. For that we must turn to the regulations." (citation omitted)); Karingithi v. Whitaker, 913 F.3d 1158, 1160 (9th Cir. 2019) ("[T]he regulations, not § 1229(a), define when jurisdiction vests."); Hernandez-Perez, 911 F.3d at 313–14. We are not persuaded. Principles of administrative law dictate that an agency cannot define its own

14

authority to hear cases; only Congress can.[4]  We therefore agree with the Fourth,

Fifth, and Seventh Circuits that 8 C.F.R. § 1003.14, despite its language, sets forth

not a jurisdictional rule but a claim-processing one.  See Pierre-Paul v. Barr, 930

F.3d 684, 691–93 (5th Cir. 2019); United States v. Cortez, 930 F.3d 350, 358–62

(4th Cir. 2019); Ortiz-Santiago, 924 F.3d at 963–64.

The problem with treating 8 C.F.R. § 1003.14 as a jurisdictional rule is this:

"Congress alone controls [an agency's] jurisdiction."  Union Pac. R.R. Co. v. Bhd.

of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, 558 U.S. 67, 71,

130 S. Ct. 584, 590 (2009); see also Charles H. Koch Jr. & Richard Murphy, 2

Admin. L. & Prac. § 5.18 ("[A]n agency may not limit its jurisdiction through its

procedural rules.").  Although jurisdiction may be a "word of many, too many,

meanings," Arbaugh v. Y&H Corp., 546 U.S. 500, 510, 126 S. Ct. 1235, 1242

(2006) (quotation marks omitted), when it is used to refer to the agency's authority

to decide a particular matter, jurisdiction means no less than the functional

equivalent of a federal court's subject matter jurisdiction.  See Cortez, 930 F.3d at

360; Ortiz-Santiago, 924 F.3d at 962–63.  And the Supreme Court has made quite

---

[4] We note, however, that in the event Congress's statutory grant of jurisdiction is ambiguous, an agency is entitled to adopt a reasonable construction of that provision.  See City of Arlington v. F.C.C., 569 U.S. 290, 301, 133 S. Ct. 1863, 1870–71 (2013).  We are not presented with such a situation here.

15

clear that an agency's power to act is "authoritatively prescribed by Congress." City of Arlington v. F.C.C., 569 U.S. 290, 297, 133 S. Ct. 1863, 1869 (2013).

For this reason, an agency cannot fashion a procedural rule to limit jurisdiction bestowed upon it by Congress. The Supreme Court's decision in Union Pacific confirms as much. There, Congress vested the National Railroad Adjustment Board (the "Board") with "jurisdiction to adjudicate grievances of railroad employees that remain unsettled after pursuit of internal procedures." Union Pacific, 558 U.S. at 71, 130 S. Ct. at 590. The Railway Labor Act additionally required employees and carriers to exhaust grievance procedures before resorting to arbitration. Id. at 73, 130 S. Ct. at 591. As part of this exhaustion process, the Act "direct[ed] parties to attempt settlement in conference" with one another. Id. (quotation marks omitted). It was undisputed in Union Pacific that the industry and its employees conferenced before approaching the Board. Id. at 76, 130 S. Ct. at 593. Nonetheless, the Board dismissed the arbitration for lack of jurisdiction because neither party initially introduced evidence that they had conferenced with one another. See id. at 77, 130 S. Ct. at 594.

The Supreme Court held that the conferencing requirement did not "condition the adjudicatory authority of the Board." Id. at 82, 130 S. Ct. at 597. The Board's jurisdiction, the Court explained, extended to "all disputes between

16

carriers and their employees growing out of grievances . . . concerning rates of pay, rules, or working conditions." Id. (quotation marks omitted).  That authority existed independent of the conferencing requirement, which imposed a requirement only "on carriers and grievants alike." Id.  The Court arrived at this conclusion even though the Board's procedural regulations provided that "[n]o petition shall be considered by any division of the Board unless the subject matter has been handled in accordance with [the grievance procedures]," precisely because "Congress gave the Board no authority to adopt rules of jurisdictional dimension." Id. at 83–84, 130 S. Ct. at 597 (quotation marks omitted).

We see no reason to deviate from the principles set forth in Union Pacific. Contrary to the position argued by the government, Congress did not stay silent on the question of jurisdiction.  Just as Congress empowered the Board in Union Pacific to adjudicate labor disputes between railroad employers and employees, so, too, did it empower IJs to "conduct proceedings for deciding the inadmissibility or deportability of an alien."  8 U.S.C. § 1229a(a)(1); see also Cortez, 930 F.3d at 360.  This broad grant of authority is not limited in any way by the filing or service of an NTA.  As we have explained, section 1229(a), states, at most, that removal proceedings are initiated upon the service of an NTA to a noncitizen.  And service requirements "are generally nonjurisdictional matters of procedure." Henderson, 517 U.S. at 656, 116 S. Ct. at 1640 (quotation marks omitted).

17

Congress has not authorized the Attorney General to promulgate regulations of "jurisdictional dimension." Union Pacific, 558 U.S. at 84, 130 S. Ct. at 597. The Immigration and Nationality Act ("INA") empowers the Attorney General to "establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2). It does not allow the Attorney General to override Congress's grant of authority. Simply put, the Attorney General can no more restrict the immigration courts' jurisdiction over removal proceedings than he (or she) can grant them jurisdiction over railway labor disputes. See Ortiz-Santiago, 924 F.3d at 963 ("While an agency may adopt rules and processes to maintain order, it cannot define the scope of its power to hear cases."). Thus, even assuming Mr. Perez-Sanchez's NTA was deficient under the regulations,[5] the agency properly exercised jurisdiction over his removal proceedings because 8 C.F.R. § 1003.14 could not have imposed jurisdictional limitations.

We do not say that 8 C.F.R. § 1003.14 regulates nothing at all. We agree with our sister circuits that the regulation sets forth a claim processing rule. See Pierre-Paul, 930 F.3d at 691–92; Cortez, 930 F.3d at 360–62; Ortiz-Santiago, 924

---

[5] Although we do not decide the issue today, we note the Seventh Circuit concluded that the NTA in 8 C.F.R. §§ 1003.13–1003.15, 1003.18, and the NTA in 8 U.S.C. § 1229(a) are one and the same. See Ortiz-Santiago, 924 F.3d at 961–62.

F.3d at 963–64.  As the Fourth Circuit recently observed, 8 C.F.R. § 1003.14 "lay[s] out the procedural steps that must be taken to docket a case before an immigration judge."  Cortez, 930 F.3d at 361.  The regulation thus "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times"—a quintessential claim-processing function.  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 435, 131 S. Ct. 1197, 1203 (2011).

Beyond that, the regulation closely resembles Federal Rule of Civil Procedure 3, which provides that "[a] civil action is commenced by filing a complaint with the court."  Like Rule 3, 8 C.F.R. § 1003.14 requires that a document—here, an NTA—be filed with the appropriate tribunal to commence proceedings.  And the Supreme Court has said that Rule 3 defects have no impact on a court's subject matter jurisdiction.  See Schlesinger v. Councilman, 420 U.S. 738, 742 n.5, 95 S. Ct. 1300, 1305 n.5 (1975) ("[S]o long as the court's subject-matter jurisdiction actually existed and adequately appeared to exist . . . any defect in the manner in which the action was instituted and processed is not itself jurisdictional and does not prevent entry of a valid judgment.").

Given this, Mr. Perez-Sanchez's Pereira challenge must fail.  Because neither 8 U.S.C. § 1229(a) nor 8 C.F.R. § 1003.14 speaks to jurisdiction, the IJ and the BIA properly exercised jurisdiction over his removal hearing based on the

19

authority conferred upon them by 8 U.S.C. § 1229a(a)(1).  Those proceedings resulted in a valid final order of removal, which we have jurisdiction to review under 8 U.S.C § 1252(a)(1), (b)(9).  We therefore deny his petition for review as to his Pereira claim.  To the extent Mr. Perez-Sanchez argues he is nonetheless entitled to a remand because his NTA violated the agency's claim-processing rules, we dismiss this part of his petition for lack of jurisdiction because he failed to exhaust the claim before the agency.  See Jeune, 810 F.3d at 800; cf. Pierre-Paul, 2019 WL 3229150, at *6 ("Assuming arguendo that Pierre-Paul's notice to appear were defective, and the defect could not be cured, Pierre-Paul waited too long to raise this issue.").

## IV.

Mr. Perez-Sanchez also argues that the BIA violated his due process rights by dismissing his appeal in the absence of a government response.  This argument fails.

The members of the BIA must "exercise their independent judgment and discretion in considering and determining the cases coming before the Board." 8 C.F.R. § 1003.1(d)(1)(ii).  That duty exists independent of any decision by the government to file a brief in opposition to the noncitizen's appeal.[6]  The agency's

---

[6] DHS, like any party before the BIA, was permitted to file a brief, but it did not have to do so.  See 8 C.F.R. § 1003.38(f).

20

decision to address the merits of Mr. Perez-Sanchez's appeal absent DHS briefing did not render his appeal fundamentally unfair. We discern no grounds for concluding that the agency's actions ran afoul of the Due Process Clause. Our conclusion today adheres to past unpublished decisions in this Circuit, see, e.g., Cenolli v. U.S. Att'y Gen., 208 F. App'x 718, 722 (11th Cir. 2006) (per curiam) (unpublished), and we deny Mr. Perez-Sanchez's petition for review as to this claim.

## V.

Last, but certainly not least, we turn to Mr. Perez-Sanchez's argument that the BIA's decision was unsupported by substantial evidence. To recap, the BIA found that although the Gulf Cartel targeted Mr. Perez-Sanchez because of his father-in-law's debt, any motive to harm him "based on his family status was at most incidental." We agree with Mr. Perez-Sanchez that this finding is not supported by any reasonable reading of the record.

To be eligible for asylum or withholding of removal, a noncitizen must prove he suffered persecution "on account of" a protected basis.[7] See Rodriguez

---

[7] The BIA, citing Matter of L-E-A-, 27 I. & N. Dec. 40 (BIA 2017), agreed with the IJ that Mr. Perez-Sanchez's proposed PSG of "his father-in-law's immediate family" was cognizable under the INA. However, the Attorney General recently reversed in part the BIA's holding in Matter of L-E-A-. See Matter of L-E-A-, 27 I. & N. Dec. 581, 596–97 (AG 2019). Because this part of Mr. Perez-Sanchez's petition for review concerns only the nexus requirement, and not the PSG requirement, we express no view on how, if at all, Matter of L-E-A- impacts Mr. Perez-Sanchez's proposed PSG or whether the Attorney General's decision is entitled to deference.

Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007) (per curiam).  This is also known as the "nexus" requirement.  See id.  After the enactment of the REAL ID Act in 2005, in order to satisfy the nexus requirement, an applicant must establish his membership in a particular social group was or is "at least one central reason" for his persecution.  8 U.S.C. § 1158(b)(1)(B)(i); see also Perez-Zenteno v. U.S. Att'y Gen., 913 F.3d 1301, 1307 (11th Cir. 2019) ("[T]o satisfy the 'on account of a statutorily protected ground' requirement, the applicant must prove that the protected ground 'was or will be at least one central reason for persecuting the applicant.'" (quoting 8 U.S.C. § 1158(b)(1)(B)(i))); Singh v. Holder, 764 F.3d 1153, 1162 (9th Cir. 2014) ("[U]nder the REAL ID Act's standard, a persecutor may be motivated by more than one central reason, and an asylum applicant need not prove which reason was dominant." (quotation marks omitted)).

In Mr. Perez-Sanchez's case, it is impossible to disentangle his relationship to his father-in-law from the Gulf Cartel's pecuniary motives: they are two sides of the same coin.  The record is replete with evidence that the Gulf Cartel sought out and continuously extorted Mr. Perez-Sanchez because of his father-in-law's past history with the cartel.  Among other things, the Gulf Cartel held Mr. Perez-Sanchez at gunpoint and told him that because Mr. Martinez-Carasco "owed them money . . .[,] [Mr. Perez-Sanchez] owed them money" as well.  Indeed, the Gulf Cartel almost executed Mr. Perez-Sanchez because of Mr. Martinez-Carasco's

22

debt, sparing him only when they realized he had enough money to specifically cover "the interest that [Martinez-Carasco] had accumulated and owed them" and could, over time, pay off Martinez-Carasco's debt.

A family debt wrongly inherited is still an inheritance.  Absent the familial relationship between Mr. Perez-Sanchez and Mr. Martinez-Carasco, the cartel would never have hunted him and his partner down to begin with or continued persecuting them for months.  The evidence compels us to reject the BIA's conclusion that Mr. Perez-Sanchez's relationship to his father-in-law played only an "incidental" role in the cartel's decision to persecute him.  It is abundantly clear to us that the family relationship was one central reason, if not the central reason, for the harm visited upon Mr. Perez-Sanchez.  We therefore grant his petition for review and remand his asylum and withholding of removal claims to the BIA for proceedings consistent with this opinion.

**PETITION DENIED IN PART, DISMISSED IN PART, GRANTED IN PART, AND REMANDED.**