NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0029n.06

No. 21-3227

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| SOFONIAS OTTONIEL TOMAS-MORALES, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| MERRICK B. GARLAND, Attorney General, | ) |
| Respondent. | ) |

**FILED**
Jan 18, 2022
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

Before: SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Soon after Sofonias Ottoniel Tomas-Morales entered the United States, immigration authorities issued him a notice to appear at proceedings to determine whether to remove him to Guatemala. Like the "notices to appear" issued to many other immigrants, this notice did not include some statutorily required information: the date and location of the removal proceedings. And like many immigrants, Tomas-Morales sought asylum in the United States because of a fear of gang harassment in his home country. He now argues that the defect in his notice to appear deprived the Board of Immigration Appeals of the jurisdiction necessary to order him removed. He further argues that the Board wrongly rejected his claim that young males subject to gang recruitment and harassment could make up a cognizable "particular social group" entitled to protection under the immigration laws. Yet the defect in his notice to appear did not deprive the Board of the authority to issue the removal order. And the Board's rejection of Tomas-

Morales's proposed "particular social group" comports with our caselaw rejecting similarly defined groups tied to gang recruitment. We thus deny his petition for review.

I

Tomas-Morales was born and raised in Guatemala. He lived with his grandparents as a child, but they passed away while he was still in school. Although his parents and several siblings also lived in Guatemala, he lost his support network once his grandparents died. Without their guidance, he could not continue with his education. Many teachers and students at his school did not take education seriously, as evidenced by their regular consumption of alcohol during the school day.

When he was still a child, therefore, Tomas-Morales dropped out of school to take a job in Guatemala City. To get to work, he had to ride the bus each day. But criminal elements on the bus would threaten to beat or murder commuters like Tomas-Morales if they did not give up their valuables. Tomas-Morales claimed that he could not report these threats to the police because the small town where he lived lacked a police department.

A severe gang problem also plagues Guatemala. Tomas-Morales's family has not been immune to it. His brother tried to open a business in their hometown, but a gang left a note on the door threatening to kill him if he did not turn over the business's earnings. His brother decided to close the business. And while gangs have never threatened Tomas-Morales personally, he still fears gang recruitment. Gangs regularly attempt to coerce young men like him to join on threat of violence.

Tomas-Morales thus opted to leave Guatemala in 2018. He traveled to the United States when he was 17 years old. Immigration authorities quickly served him with a "notice to appear" alleging that he was subject to removal from this country. Tomas-Morales conceded that he was

removable but applied for asylum, withholding of removal, and protection under the Convention Against Torture. As his grounds for seeking this relief, he claimed that he suffered past persecution and feared future persecution as a result of his status as a young male subject to gang harassment and recruitment in Guatemala.

An immigration judge denied relief. The judge held that Tomas-Morales was not entitled to asylum or withholding of removal because the prior threats on the bus did not rise to the level of past "persecution" and because any future gang threats would not be based on a characteristic protected by the asylum and withholding-of-removal statutes. Although these statutes protect against persecution because of an immigrant's membership in a "particular social group," the judge reasoned that Tomas-Morales's proposed social group of young males subject to gang recruitment and harassment was not a valid one. The judge also denied relief under the Convention Against Torture because Tomas-Morales had not shown a realistic risk that he would suffer torture in Guatemala or that the country's government would acquiesce in that violence. The Board of Immigration Appeals agreed with the immigration judge's analysis on Tomas-Morales's asylum and withholding-of-removal claims. It found that he forfeited his claim under the Convention Against Torture.

## II

Tomas-Morales now petitions our court to review the Board's decision. He raises two arguments. First, he argues that the Board lacked jurisdiction over his removal proceedings. Second, he argues that the Board erred on the merits when denying him relief from removal.

### A. Jurisdiction

Tomas-Morales contends that the immigration judge lacked "jurisdiction" over his removal proceedings because the immigration authorities issued a defective "notice to appear" to initiate

them. He is correct in pointing out that the authorities issued a defective notice to appear, but incorrect in claiming that this defect affected the executive branch's jurisdiction.

Tomas-Morales's argument rests on two Supreme Court decisions about a document called a "notice to appear" and a remedy called "cancellation of removal." The removal statutes indicate that an immigration judge within the executive branch "shall conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). They add that a "written notice" described as "a notice to appear" "shall be given" to an immigrant subject to these removal proceedings. *Id.* § 1229(a)(1). And they require this "notice to appear" to contain, among other things, the "time and place at which the proceedings will be held." *Id.* § 1229(a)(1)(G)(i). The cancellation-of-removal statute elsewhere allows the Attorney General to "cancel" the "removal" of immigrants who meet various requirements, including that they have been in this country for at least ten years at the time that they receive their "notice to appear." *Id.* § 1229b(b)(1)(A), (d)(1).

For years, immigration authorities did not include the statutorily mandated information on the time and place of the removal proceedings in the initial notice sent to immigrants; the authorities included this information only in subsequently issued notices. *Pereira v. Sessions*, 138 S. Ct. 2105, 2111 (2018). In *Pereira*, the Court held that an initial notice lacking this information does not qualify as a valid "notice to appear" and so cannot be used to decide whether an immigrant has been in this country for the ten years required to be eligible for cancellation-of-removal relief. *Id.* at 2113–20. This decision, in effect, gave immigrants served with invalid notices more time to meet this ten-year presence requirement. Recently, the Court further clarified that immigration authorities cannot provide an immigrant with all of the information that must be in a "notice to appear" across two separate documents. Rather, the authorities must provide a single document with all statutorily required information in order for the document to be a valid

4

"notice to appear" that can be used to determine the immigrant's cancellation-of-removal eligibility. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480–86 (2021).

There is no dispute in this case that the notice to appear given to Tomas-Morales lacked all information required by this statutory scheme. It did not list the date and location of his removal proceedings and ordered him to appear before an immigration judge "at a time and place to be determined." Admin. R. (A.R.) 269. Yet Tomas-Morales does not seek the cancellation-of-removal relief that the Court addressed in *Pereira* and *Niz-Chavez*. (He has obviously not been in this country for ten years from the date of his 2018 entry.) Tomas-Morales instead argues more broadly that his defective notice to appear deprived the immigration judge (and the Board) of "jurisdiction" to adjudicate his removal proceedings. By "jurisdiction," he means the type of subject-matter jurisdiction that Article III courts must possess to have the "power to hear a case." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). So he claims that we must treat the Board's removal order as *ultra vires* because the Board issued it without the necessary adjudicative power.

Both text and precedent foreclose Tomas-Morales's jurisdictional argument. Start with the statutory text. The statute does not treat the "notice to appear" as an item necessary to establish the executive branch's subject-matter jurisdiction. Indeed, the statute does not even use the word "jurisdiction." 8 U.S.C. § 1229(a)(1). So while its text makes clear that immigration authorities must give a proper "notice to appear" to immigrants in removal proceedings, it does not more broadly note that all mistakes in meeting this mandate deprive the executive branch of the "power" to hear a dispute. *Arbaugh*, 546 U.S. at 514; *Santos-Santos v. Barr*, 917 F.3d 486, 490 (6th Cir. 2019); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 313 (6th Cir. 2018). As we recently suggested, moreover, it is not even clear that the concept of "subject-matter jurisdiction," so well established

5

for Article III courts, makes sense for Article II agencies. *See Mendoza-Jovel v. Garland*, 860 F. App'x 389, 392 n.4 (6th Cir. 2021) (citing *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).

Turn to precedent. After the Supreme Court decided *Pereira*, our court and the other circuit courts widely rejected arguments like Tomas-Morales's claim that a defective notice to appear deprived the executive branch of subject-matter jurisdiction over immigration proceedings. *See Santos-Santos*, 917 F.3d at 489–91; *Hernandez-Perez*, 911 F.3d at 310–15; *see also Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1153–57 (11th Cir. 2019); *Pierre-Paul v. Barr*, 930 F.3d 684, 688–93 (5th Cir. 2019), *abrogated in part on other grounds by Niz-Chavez*, 141 S. Ct. 1474; *Nkomo v. Att'y Gen. of U.S.*, 930 F.3d 129, 132–34 (3d Cir. 2019); *Ortiz-Santiago v. Barr*, 924 F.3d 956, 959–65 (7th Cir. 2019); *Banegas Gomez v. Barr*, 922 F.3d 101, 110–12 (2d Cir. 2019).

Tomas-Morales responds that this precedent is now bad law after *Niz-Chavez*. According to him, these courts held that the immigration judge had jurisdiction because the immigration authorities had issued a *second* notice that included the time and location information missing from the first one. *See, e.g.*, *Hernandez-Perez*, 911 F.3d at 314–15; *Pierre-Paul*, 930 F.3d at 690–91. Because *Niz-Chavez* held that this two-step process does not create a "valid" notice to appear, his argument goes, that decision makes clear that immigration judges lack jurisdiction when immigration authorities issue defective notices to appear.

Tomas-Morales's argument lacks merit because the circuit precedent did not rest on the logic that he claims. To be sure, these pre-*Niz-Chavez* decisions were not consistent on the reasons why immigration judges had jurisdiction despite a defective notice to appear. Some courts (including our own) relied on regulations suggesting that notices to appear need not include the time and place of the removal proceedings for jurisdiction to vest with immigration judges. *See* 8 C.F.R. §§ 1003.13; 1003.14(a), 1003.15(b); *see, e.g.*, *Banegas Gomez*, 922 F.3d at 111; *Santos-*

*Santos*, 917 F.3d at 490–91. Other courts reasoned that the regulations did not matter to this jurisdictional inquiry because an agency cannot change the scope of its jurisdiction. These courts instead relied solely on the fact that the statutes did not make the notice-to-appear requirements jurisdictional. *See Perez-Sanchez*, 935 F.3d at 1154–57; *Ortiz-Santiago*, 924 F.3d at 959–65.

Under either view, *Niz-Chavez* did not affect the outcome. Under the view that rests on the regulations, those regulations simply do not require notices to appear to contain the time and place of the removal proceedings for immigration judges to have jurisdiction. Under the view that rests on the statute alone, it likewise contains no text making the notice-to-appear requirement jurisdictional. Even after *Niz-Chavez*, therefore, courts in both of these camps continue to hold that immigration judges have jurisdiction even if immigration authorities initiate removal proceedings with a defective notice to appear. *See Ramos Rafael v. Garland*, 15 F.4th 797, 800–01 (6th Cir. 2021); *see also, e.g.*, *Chery v. Garland*, 16 F.4th 980, 986–87 (2d Cir. 2021); *United States v. Calan-Montiel*, 4 F.4th 496, 497–98 (7th Cir. 2021); *Maniar v. Garland*, 998 F.3d 235, 242 n.2 (5th Cir. 2021). The immigration judge thus had the power to adjudicate Tomas-Morales's case despite the defective notice to appear.

## B. Merits

Tomas-Morales next argues that the Board wrongly denied him asylum and withholding of removal because he established that he had previously been persecuted in Guatemala and that he had a well-founded fear of future persecution there. We need not consider whether Tomas-Morales's prior persecution rose to the required level of harm or whether he faces an objectively serious threat of future harm. Even if he established these things, his claim would still fail because he has not shown that any such harm would result from a characteristic that the asylum and withholding-of-removal statutes protect.

These two statutes do not permit the Attorney General to grant immigrants relief from removal whenever they might face harm in their home countries. Immigrants must instead show that this harm will arise because of a trait that the statutes protect, such as their "membership in a particular social group." Specifically, the asylum statute gives the Attorney General discretion to grant asylum to "refugees," 8 U.S.C. § 1158(a)–(b), a term defined to include immigrants who are unwilling to return to their home country "because of persecution or a well-founded fear of persecution on account of" their "membership in a particular social group," *id.* § 1101(a)(42)(A). The withholding-of-removal statute likewise prohibits the Attorney General from removing immigrants to a country where their "life or freedom would be threatened" "because of" their "membership in a particular social group[.]" *Id.* § 1231(b)(3)(A). Tomas-Morales claims that he would face harm because of his membership in the particular social group of "young Guatemalan males subject to gang harassment and recruitment lacking protection from the police." A.R. 3.

This claim fails because Tomas-Morales's proposed group does not qualify as a "particular social group" under our caselaw. We have long deferred to the Board's interpretation of this phrase under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Castro-Paz v. Holder*, 375 F. App'x 586, 589–91 (6th Cir. 2010); *Castellano-Chacon v. INS*, 341 F.3d 533, 546 (6th Cir. 2003), *modified on other grounds by Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006). Over time, the Board has established various requirements for a proposed group to qualify as a statutorily protected "particular social group." *See, e.g.*, *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013). We have upheld each of the Board's requirements. *See, e.g.*, *id.* at 671–72. As relevant here, the Board has held that a proposed group must be "particular"—a requirement that has an obvious textual source in the phrase "particular social group." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 239 (BIA 2014).

To be "particular," a social group must "be discrete and have definable boundaries" so that individuals will have little difficulty discerning who falls within the group and who falls outside it. *Id.*; *see Orellana v. Sessions*, 722 F. App'x 443, 449 (6th Cir. 2018). To satisfy these criteria, the terms that an immigrant uses to define the social group must have definite meanings. *See Castro-Castaneda v. Barr*, 778 F. App'x 376, 378 (6th Cir. 2019). This rule comports with the ordinary understanding of the phrase "particular" because a "particular" social group is a social group that includes "a single definite" "set" of "persons, as distinguished from others." 11 *Oxford English Dictionary* 270 (2d ed. 1989). Conversely, a proposed social group will not be particular if it is "amorphous, overbroad, diffuse, or subjective." *M-E-V-G-*, 26 I. & N. Dec. at 239.

We have thus rejected social-group definitions that were "generalized" or "sweeping" because the proposed groups could encompass any unknown number of people depending on how they were applied. *Rreshpja v. Gonzales*, 420 F.3d 551, 555 (6th Cir. 2005). Of most note for this case, we have repeatedly rejected on these "particularity" grounds proposed social groups defined to include those who refused to join or who were threatened by criminal gangs. *See Gaspar-Mateo v. Barr*, 783 F. App'x 600, 604 (6th Cir. 2019) (collecting cases). In one case, for example, we rejected the proposed group of "young Salvadorans who have been threatened because they refused to join the MS gang[.]" *Umaña-Ramos*, 724 F.3d at 673 (citation and alteration omitted). We found that this group was not particular because it did not describe a "distinct" set of people. *Id.* at 674. In another case, we likewise rejected a proposed social group that was "primarily defined as young men who resist gang recruitment." *Perez-Ramirez v. Garland*, 2021 WL 4988351, at *3 (6th Cir. Oct. 27, 2021). We reasoned that gangs recruit many people, so the group did "not have a clear boundary that separates it from the rest of society." *Id.*; *see also, e.g.*, *Abarca-Fuentes v.*

*Garland*, 852 F. App'x 1021, 1024–25 (6th Cir. 2021); *Juan-Mateo v. Sessions*, 729 F. App'x 446, 449 (6th Cir. 2018); *Castro v. Holder*, 530 F. App'x 513, 517 (6th Cir. 2013).

This caselaw forecloses Tomas-Morales's proposed social group. Like the proposed groups in these other cases, the category of "young Guatemalan males subject to gang harassment and recruitment" could include all Guatemalan young men who are not already members of a gang. A.R. 4. In fact, the record evidence suggests that the "majority of the school-age population" in some areas of Guatemala has stopped socializing due to fear of gang violence. A.R. 214. That is too diffuse a group to identify a "particular" set of people. *See Umaña-Ramos*, 724 F.3d at 674.

\* \* \*

One last point. Tomas-Morales argued to the immigration judge that he also warranted relief under the Convention Against Torture. Although his briefs in this court mention the Convention in passing, they contain no sustained argument as to why the immigration judge erred when denying this relief or why the Board erred in holding that he had forfeited his request for it. Without developed argumentation, Tomas-Morales has also forfeited any request for this distinct form of relief in our court. *See Mbonga v. Garland*, 18 F.4th 889, 899 (6th Cir. 2021).

For these reasons, we deny the petition for review.