[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————

No. 20-11123

Non-Argument Calendar

————————————

CARLOS ALBERTO CORDOVA-GARCIA,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

————————————

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A212-994-755

————————————

Before JILL PRYOR, LAGOA, and WILSON, Circuit Judges.

PER CURIAM:

Carlos Cordova-Garcia petitions for review of a decision from the Board of Immigration Appeals affirming an immigration judge's denial of his applications for asylum and withholding of removal. He argues that substantial evidence does not support the denial of the asylum claim and that the Board used the wrong standard to evaluate the withholding-of-removal claim. After careful review, we deny the petition.

**I.**

Cordova-Garcia, a citizen of El Salvador, entered the United States in 2017. He was charged with being removable as a noncitizen present in the United States without being admitted or paroled and as a noncitizen not in possession of a valid entry document at the time of admission. *See* 8 U.S.C. § 1182(a)(6)(A)(i), (a)(7)(A)(i)(I). An immigration judge found that he was removable as charged.

Cordova-Garcia applied for asylum and withholding of removal, claiming that he suffered past persecution in El Salvador and had a well-founded fear of future persecution if he returned there.[1] At a hearing before an immigration judge, Cordova-Garcia

---

[1] Cordova-Garcia also applied for protection under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. Because his petition does not challenge the denial of his CAT claim, we do not address this claim.

testified that he had worked in sales in El Salvador but was forced to flee the country because of threats from the MS-13 gang.

In his testimony, Cordova-Garcia described his interactions with gang members, which began when gang members came to his stepchildren's school. They attempted to recruit his stepson to join the gang and store drugs or money for the gang and serve as a lookout. They wanted his stepdaughter to become the girlfriend of one of the gang members. When Cordova-Garcia heard that gang members were at the children's school, he immediately headed there. When he arrived at the school, armed gang members told him of their plans for the children and threatened to kill him and kidnap the children if he resisted. Cordova-Garcia fled from the school with the children. Shortly after this incident, he sent his wife and children to the United States.

After Cordova-Garcia sent his family to the United States, several gang members, carrying bats and pistols, confronted him for disobeying their order and sending the children away. They put a 150-pound weight on his shoulders and told him to do 150 squats or sell drugs for them. They warned him that if they came back a second time, they would beat him, and if they came back a third time, they would kill him. Still, Cordova-Garcia refused to help the gang. Instead, he fled El Salvador for the United States.

At the hearing, the immigration judge asked Cordova-Garcia why he did not move his family to another area in El Salvador. He answered that they could not safely relocate within El Salvador because the gang controlled the entire country and investigated

any individual who moved to a new village, meaning that the gang would be able to track them down. He testified that he did not report the incidents to police because they were paid off by gang members.

The record before the immigration judge also included a State Department country report for El Salvador. The report stated that there was widespread extortion and crime in El Salvador with gangs targeting people and creating a climate of fear. It noted that thousands of children had dropped out of school because of gang threats. It also reported that gangs recruited children to perform illicit activities related to the drug trade and that women and girls were targeted for violence by gang members. And it detailed the difficulties that individuals fleeing gangs had in relocating within El Salvador.

The immigration judge denied Cordova-Garcia's applications for asylum and withholding of removal and ordered him removed to El Salvador. He appealed to the BIA, which dismissed his appeal. He then filed a petition for review in this Court. While the petition was pending, the Attorney General filed a motion to remand. The motion sought remand so that the Board could determine whether to remand the case to the immigration judge for factual findings on whether Cordova-Garcia's family membership was, or would be, one central reason for his alleged persecution and noted that the immigration judge had failed to make any factual findings on this issue. We granted the motion and remanded

the case to the Board, which then remanded the case to the immigration judge.

On remand, the immigration judge held a new evidentiary hearing. Cordova-Garcia again testified about how the gang tried to recruit his stepchildren and threatened him. He stated that he feared returning to El Salvador because he believed that he and his family would be assassinated.

Cordova-Garcia was asked whether the gang tried to recruit other children in his community. He admitted that many children in his community were recruited. He was then asked what would have happened if a teacher at the school had interfered with the attempt to recruit his stepchildren and told gang members to leave them alone. Cordova-Garcia answered that the gang members would have targeted the teacher. He acknowledged that gang members decided to recruit his stepchildren before he engaged in any action to oppose the gang.

The immigration judge denied Cordova-Garcia's applications for asylum and withholding of removal. He explained that to be entitled to asylum a noncitizen had to show, among other things, membership in a protected particular social group and that "one central reason" for any persecution he suffered in the past or would suffer in the future was due to his membership in the particular social group. AR at 106.[2]

---

[2] "AR" refers to the administrative record.

The immigration judge concluded that Cordova-Garcia failed to carry his burden on the asylum claim. He reasoned that the proposed social group—membership in Cordova-Garcia's family—did not qualify as a legally cognizable particular social group. Furthermore, even assuming that Cordova-Garcia had identified a legally cognizable particular social group, he had not established that any past persecution was, or any future persecution would be, on account of his membership in this group. The immigration judge found that the evidence showed "that the one central reason" the gang targeted Cordova-Garcia was because he "indicated to gang members that he would not allow [his] two children to join the MS-13 gang." *Id.* at 107. The immigration judge also concluded that he failed to show he was eligible for withholding of removal.

Cordova-Garcia appealed to the BIA, which dismissed the appeal. It affirmed the immigration judge's decision that Cordova-Garcia failed to show that "his membership in his nuclear family was one central reason for his purported persecutors' decision to target him for harm." *Id.* at 3 (internal quotation marks omitted). It explained that the record showed that the gang was not "motivated by [his] family membership, but rather by his actions in disrupting the gang's recruiting efforts." *Id.* It also concluded, in the alternative, that the immigration judge properly determined that Cordova-Garcia's proposed particular social group—his family—was not a legally cognizable social group.

The Board also concluded that because Cordova-Garcia failed to establish his eligibility for asylum, he was not entitled to

withholding of removal. It explained that the burden of proof for withholding of removal was more stringent than the burden for asylum.

This is Cordova-Garcia's petition for review.

## II.

We review the decision of the Board. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). We review the decision of the immigration judge only "to the extent that the Board expressly adopted" the immigration judge's opinion. *Id.* (internal quotation marks omitted). We review *de novo* the Board's conclusions of law. *Id.* And we review its factual determinations under a substantial evidence standard, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026–27 (11th Cir. 2004) (en banc). Findings of fact may be reversed "only when the record compels a reversal." *Id.* at 1027. "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.*

## III.

In the petition for review, Cordova-Garcia challenges the Board's decision affirming the immigration judge's denial of his applications for asylum and withholding of removal. We address each in turn.

**A.**

Under the Immigration and Nationality Act ("INA"), a noncitizen who is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The government may grant asylum only if an applicant establishes that he is a "refugee." *Id.* § 1158(b)(1)(A). A refugee is a person "who is unable or unwilling to return to" his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A).

To be eligible for asylum, an applicant must show "(1) past persecution on account of a statutorily listed factor" or "(2) a well-founded fear that the statutorily listed factor will cause future persecution." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (internal quotation marks omitted). Persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation," and "mere harassment does not amount to persecution." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005) (alteration adopted) (internal quotation marks omitted).

But it is not enough for the noncitizen to show that he faced past persecution or has a well-founded fear that he will face future persecution. He also must satisfy a "nexus" requirement, meaning he must prove that the persecution was, or would be, "on account of a protected basis," such as membership in a particular social group. *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1158 (11th

Cir. 2019) (internal quotation marks omitted). "[T]o satisfy the nexus requirement, an applicant must establish his membership in a particular social group was or is 'at least one central reason' for his persecution." *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). A central reason is one that "is essential to the motivation of the persecutor." *Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1286 (11th Cir. 2021) (internal quotation marks omitted). "In other words, the protected ground cannot play a minor role in the [applicant's] past mistreatment or fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (internal quotation marks omitted). Evidence that "merely shows that a person has been the victim of criminal activity" or acts of "private violence" does not establish persecution based on a statutorily protected ground. *Ruiz*, 440 F.3d at 1258.

Here, Cordova-Garcia argues that the agency made erroneous determinations in reviewing his asylum application when it concluded that: (1) his proposed particular social group was not legally cognizable and (2) he failed to establish a nexus between his membership in the proposed particular social group and the harm that he had faced, or would face, in El Salvador. We need not address the first issue because even assuming Cordova-Garcia identified a legally cognizable particular social group, substantial evidence supports the determination made by the immigration judge and affirmed by the Board that he failed to establish a nexus.

In previous cases, we have analyzed the nexus requirement where, like here, a non-citizen claims membership in a family-

based particular social group. In *Sanchez-Castro*, an El Salvador citizen petitioned for review of the denial of her asylum claim in which she asserted that gang members targeted her family based on the assumption that her father's work in the United States made her family wealthy. 998 F.3d at 1283–84. We held that substantial evidence supported the decision that the petitioner failed to satisfy the nexus requirement because the gang targeted her family to obtain money, not because of any animus against the family. *Id.* at 1286–87. In doing so, we distinguished persecution because of membership in a family from persecution for some other, tangential reason: "Where a gang targets a family only as a means to another end, the gang is not acting because of who the family is; the identity of the family is only incidentally relevant." *Id.* at 1287; *see Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310–11 (11th Cir. 2013) (concluding that petitioner failed to establish nexus for his family-based particular social group because the record reflected that a gang had targeted members of his family "due to their failure to cooperate with the drug traffickers" instead of because of their membership in the family).

We also considered the nexus requirement in connection with a family-based particular social group in *Perez-Sanchez*. In that case, Perez-Sanchez, the applicant, was threatened, beaten, and extorted by members of a cartel in Mexico. 935 F.3d at 1150–51. Perez-Sanchez's father-in-law owed a debt to the cartel after losing a shipment of more than 500 kilograms of cocaine that belonged to the cartel. *Id.* at 1150. Years after the cocaine was lost, cartel members tracked down Perez-Sanchez and demanded that he provide

information about his father-in-law's whereabouts. *Id.* Perez-Sanchez had no information about this man who had long ago abandoned the family. *Id.* at 1151. Members of the cartel nevertheless brutally beat Perez-Sanchez fracturing his collarbone and one of his ribs and telling him that he was responsible for his father-in-law's debt. *Id.* After the beating, Perez-Sanchez made monthly payments to the cartel. *Id.*

After fleeing to the United States, Perez-Sanchez applied for asylum and withholding of removal. *Id.* at 1151–52. The agency denied the application, concluding that his "relationship to his father-in-law played only an 'incidental' role in the cartel's decision to persecute him." *Id.* at 1158. We held that substantial evidence did not support this decision because "[a]bsent the familial relationship between [] Perez-Sanchez and [his father-in-law], the cartel would never have hunted him and his partner down to begin with or continued persecuting them for months." *Id.* We concluded that it was "impossible to disentangle [Perez-Sanchez's] relationship to his father-in-law from the [cartel's] pecuniary motive," saying they were "two sides of the same coin." *Id.* We explained that the record was "replete" with evidence that the cartel had targeted Perez-Sanchez "*because* of his father-in-law's past history with the cartel." *Id.* (emphasis in original). Because the record compelled us to conclude that the familial relationship was a central reason for the persecution, we granted the petition. *Id.* at 1158–59.

Here, we cannot say that the record compels a conclusion that Cordova-Garcia satisfied the nexus requirement. Certainly,

the record reflects that gang members singled Cordova-Garcia out for physical abuse and threatened to kill him after he resisted the gang's efforts to recruit his stepchildren. But the record also shows that the gang would have targeted anyone who interfered with its efforts to recruit children. We agree with the Attorney General that, based on the record, a factfinder could conclude that "the gang members targeted Cordova-Garcia because he opposed their recruitment efforts, and not because of his membership in his particular family." Respondent's Br. 23. As a result, we cannot say that the record compels a conclusion that Cordova-Garcia's familial relationship was one central reason why he was, or would be, targeted or threatened. *See Sanchez-Castro*, 998 F.3d at 1283. We conclude that substantial evidence supports the decision denying Cordova-Garcia's asylum application.

## B.

We now turn to Cordova-Garcia's challenge to the denial of his application for withholding of removal. Under the INA, the government may not remove a noncitizen in the United States to a country where his "life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To be entitled to withholding of removal, an applicant must show that it is more likely than not that he would be persecuted or tortured upon his return to the country in question. *Sanchez v. U.S. Att'y Gen.*, 392 F.3d 434, 437 (11th Cir. 2004). We have recognized that to be entitled to withholding of removal, an applicant must satisfy

the same nexus requirement that applies in asylum cases. *See Perez-Sanchez*, 935 F.3d at 1158.

In his petition, Cordova-Garcia argues that the Board applied too demanding of a causation standard to his withholding-of-removal claim. He says that to be eligible for withholding of removal, he needed to show only that his family membership was "a reason," as opposed to one central reason, for the threat he faced if returned to El Salvador. Petitioner's Br. 24–25.

Before we reach the merits of this challenge, we must consider whether Cordova-Garcia exhausted his administrative remedies. Under the INA, a "court may review a final order of removal only if" the noncitizen "has exhausted all administrative remedies available . . . as of right." 8 U.S.C. § 1252(d)(1). This exhaustion requirement is satisfied when a noncitizen "previously argued the core issue now on appeal before the [Board]." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015) (internal quotation marks omitted). "Requiring exhaustion allows the [Board] to consider the niceties and contours of the relevant arguments, thereby fully considering the petitioner's claims and compiling a record which is adequate for judicial review." *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006) (alterations adopted) (internal quotation marks omitted). [3]

---

[3] This exhaustion requirement is a non-jurisdictional, claim-processing rule. *Santos-Zacaria v. Garland*, 598 U.S. 411, 419 (2023). Because it is a claim-processing rule, we must enforce the exhaustion requirement where, as here, the

We cannot reach the merits of Cordova-Garcia's challenge to the denial of his application for withholding of removal because he failed to exhaust administrative remedies. Although he now argues that an applicant for withholding of removal establishes the requisite nexus if he shows that a protected ground would be a reason—as opposed to a central reason—for any threats he would face if removed, he did not raise this issue to the Board and instead argued only under the one central reason standard. Because Cordova-Garcia did not raise this issue before the Board, he failed to exhaust administrative remedies.

But even if Cordova-Garcia had adequately raised this issue before the Board and exhausted administrative remedies, we would have to deny his petition. We previously adopted the "one central reason" standard to evaluate whether an applicant has established a sufficient nexus for a withholding-of-removal claim. *See Sanchez-Castro*, 998 F.3d at 1286. Under our prior panel precedent rule, we are bound by this decision. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001).

**PETITION DENIED.**

---

government properly asserts it. *See Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023).