[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 21-10582

Non-Argument Calendar

————————————————

EUSEBIO LOPEZ-SARABIA,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A206-472-702

————————————————

Before WILSON, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Eusebio Lopez-Sarabia, a Mexican citizen, petitions for review of the Board of Immigration Appeals's decision affirming the immigration judge's denials of cancellation of removal, termination of the proceedings under a claim-processing rule, and relief under the Convention Against Torture. We deny the petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Lopez-Sarabia unlawfully entered the United States at an unknown location on an unknown date. He testified that he last entered the United States around September 2000. On March 11, 2008, and then again on June 8, 2015, he was arrested for driving under the influence. The June 2015 arrest was also for driving without a driver's license. Lopez-Sarabia was ultimately found guilty of all three offenses. He testified that he gave the false name "Macario Cruz" to law enforcement during his arrests because he wanted to remain undetected until his son Eusebio Lopez, Jr., a United States citizen, could petition for him to have legal status in the United States.

Lopez-Sarabia's June 2015 arrest brought him to the attention of United States Immigration and Customs Enforcement within the Department of Homeland Security. The department started removal proceedings against him by filing a notice to appear with the immigration judge. The notice ordered Lopez-Sarabia to

appear before an immigration judge at a location "to be determined" on a date and time "[t]o be set." The department charged him with removability under the Immigration and Nationality Act—specifically, 8 U.S.C. section 1182(a)(6)(A)(i) for being a non-United States citizen "present in the United States without being admitted or paroled" and 8 U.S.C. section 1182(a)(7)(A)(i)(I) for not having a "valid entry document" at the time of admission.

At a July 29, 2015 removal hearing, Lopez-Sarabia admitted the facts in the notice to appear, as well as the section 1182(a)(6)(A)(i) removability charge, but contested the section 1182(a)(7)(A)(i)(I) charge. The immigration judge sustained both charges.

Lopez-Sarabia indicated that he would file an application for cancellation of removal under 8 U.S.C. section 1229b(b)(1) and relief under the Convention Against Torture. Lopez-Sarabia identified Lopez, Jr., then eighteen years old, as his qualifying relative for cancellation of removal purposes. *See* 8 U.S.C. § 1229b(b)(1)(D) (requiring a removable noncitizen who seeks cancellation of removal to show, among other things, that "removal would result in exceptional and extremely unusual hardship to [his] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence").

Lopez-Sarabia moved to terminate the removal proceedings because he received a legally deficient notice to appear under *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). He maintained that the notice to appear did not comply with 8 U.S.C. section

1229(a)(1)(G)(i) because it did not provide a date, time, or address for his first hearing, and, because of the notice's deficiencies, the immigration judge lacked jurisdiction over the proceedings. The immigration judge disagreed, explaining that *Pereira* focused on the narrow issue of whether a deficient notice to appear triggered "the stop-time rule." The immigration judge further reasoned that the Supreme Court's silence as to jurisdiction and its order to remand strongly suggested that jurisdiction was proper.

Lopez-Sarabia provided testimony and documentation to support his application for cancellation of removal and relief under the Convention Against Torture.[1] Lopez-Sarabia testified at length about his wife Gabina Bravo-Roman and their son Lopez, Jr. Lopez-Sarabia explained that his wife suffered from a mobility condition because of a car accident and a bad hip operation and that the condition required her to walk with a cane and to attend physical therapy, caused her extensive back pain, and had prevented her from working for about three years. According to Lopez-Sarabia, Lopez, Jr. was studying mechanical engineering at the University of Florida on a scholarship, lived with Bravo-Roman and him, and received emotional and, occasionally, financial support from him. Lopez-Sarabia testified that if he were removed, Lopez, Jr. would have to take care of Bravo-Roman instead of study, and Lopez-

---

[1] Lopez-Sarabia also applied for asylum and withholding of removal, but he expressly waived these claims in his petition for review. So we don't discuss them further.

Sarabia wouldn't be able to support his family financially because he would earn a maximum of about four or five dollars a day in Mexico. Lopez, Jr. corroborated this testimony, stating that given Bravo-Roman's poor health, he would not be able to depend on her if Lopez-Sarabia were removed, that Lopez-Sarabia provided him financial support, and that without this support, Lopez, Jr. did not know how he would provide for himself while also attending college.

Regarding taxes, Lopez-Sarabia testified that even though he lived in the United States since 2000, he submitted tax returns only for 2016; he didn't submit tax returns for any other year "[b]ecause [he] was getting paid in cash." On advice of counsel, Lopez-Sarabia exercised his right to remain silent and said no more about any past tax returns, but because the removal proceedings were civil, not criminal, the immigration judge drew a negative inference from his silence.

Lopez-Sarabia also testified about why he was afraid to return to Mexico. He described four incidents that occurred in Mexico and affected different members of his family. First, Lopez-Sarabia stated that when he was about seven or eight years old, someone wrongly accused his father of shooting someone else, which led to his father's arrest and, ultimately, acquittal. Second, Lopez-Sarabia said that about eight years ago, armed gang members surrounded his sister Ines Lopez to find out information about a rival gang. Third, Lopez-Sarabia testified that his nephew Carlos Lopez was killed by armed gang members. Lopez-Sarabia's son Victor

Lopez corroborated this testimony and added that Carlos Lopez was killed "in the street" and "[n]o one [knew] the reason."

And fourth, according to Lopez-Sarabia, a group of armed men affiliated with the Mexican law enforcement organization La Procuraduría General de la República went to his home and broke down his door in 2004, when his family was living there without him. Lopez-Sarabia stated that the men were executing a search warrant for drugs, left when they didn't find anything, and didn't return. Lopez-Sarabia further testified that Bravo-Roman put in a claim with the city and the city ordered the organization to repair the damage to the doors and that to his knowledge, there was no active warrant against him in Mexico.

Victor Lopez, who was present during the search, elaborated on it. He testified that in the early morning hours of a March 2004 day, about twenty La Procuraduría General de la República agents wearing face coverings, bulletproof vests, military helmets, and police attire violently entered the house, broke down the door to his room, yelled at his family to get out, and pointed weapons at Bravo-Roman and him. Victor Lopez said that the agents were looking for drugs, weapons, and Lopez-Sarabia and left when they didn't find them.

When Lopez-Sarabia was asked why his family hadn't sought asylum when they first entered the United States, he claimed ignorance of the law. Also, he stated that "[a]t the moment," he did not know of any other family members who "had issues in any way, shape[,] or form with the police or with the

growing delinquency in Mexico." And he testified that "[his] biggest concern [was] the criminality, the delinquency that exist[ed] in [his] country, primarily where [he was] from," and that "the only thing" that made him afraid to return to Mexico was "[t]he delinquency and criminality." Victor Lopez testified that he was concerned about the violence in Mexico "[f]rom the drug cartels" and "from the very police from there," who sometimes randomly attacked people "for fun."

The immigration judge denied Lopez-Sarabia's applications and ordered him removed to Mexico. The immigration judge found that Lopez-Sarabia established his continuous physical presence in the United States for ten years and that Lopez, Jr. would suffer exceptional and extremely unusual hardship if Lopez-Sarabia were removed. But the immigration judge determined that Lopez-Sarabia didn't warrant discretionary cancellation of removal because he failed to pay his taxes for years, because his second conviction for driving under the influence showed that he was not rehabilitated and hadn't accepted responsibility after his first, and because he provided a false name during the arrests to avoid detection until Lopez, Jr. could petition for him.

As to the Convention Against Torture, the immigration judge concluded that Lopez-Sarabia failed to show that the Mexican government would torture him or acquiesce in his torture; in fact, Mexico was in the process of fighting against crime and corruption. And as to post-conclusion voluntary departure, the immigration judge found that Lopez-Sarabia could not pay the five

hundred dollar bond and that the same factors that weighed against cancellation of removal also weighed against voluntary departure.

Lopez-Sarabia appealed the immigration judge's decision to the board.  Lopez-Sarabia contended that the immigration judge correctly found him eligible for cancellation of removal under the Act but incorrectly denied his applications "because he lacked good moral character and as a matter of discretion."  He further argued that, although his notice to appear was deficient under a claim-processing, rather than jurisdictional, rule, the removal proceedings should be terminated because they were based on a notice that violated the rule.

The board affirmed the immigration judge's decision and dismissed Lopez-Sarabia's appeal.  The board concluded that the immigration judge had jurisdiction despite Lopez-Sarabia's allegedly deficient notice to appear.  As to cancellation of removal, the board concluded that because Lopez, Jr. turned twenty-one during the pendency of the appeal, he was no longer a child and Lopez-Sarabia no longer had any qualifying relative.  The board added that even if Lopez-Sarabia were eligible for cancellation of removal, he was not entitled to it as a matter of discretion because his history of not paying taxes, convictions for driving under the influence, and use of a false name when arrested outweighed the equities in his favor.  And, as to the Convention Against Torture, the board discerned no error in the immigration judge's determination that Lopez-Sarabia failed to establish that, more likely than not, the

Mexican government would torture him or acquiesce in his torture if he were removed.

## STANDARD OF REVIEW

We review our subject matter jurisdiction de novo. *Ruiz v. Gonzales*, 479 F.3d 762, 765 (11th Cir. 2007). When the board agrees with the immigration judge's determination on an issue, we review both the board's decision and the immigration judge's decision on that issue. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). We review the board's factual findings under the "highly deferential" substantial evidence standard, which requires us to "accept administrative findings as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (quotations omitted); *accord Ruiz*, 479 F.3d at 765 ("[We] must affirm the [board]'s decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. To conclude the [board]'s decision should be reversed, we must find that the record not only supports the conclusion, but compels it." (quotations omitted)).

## DISCUSSION

Lopez-Sarabia raises three issues in his petition. First, he contends that the board erred in concluding that he was no longer eligible for cancellation of removal because Lopez, Jr. was no longer a child under the Act when it decided his appeal and that we have jurisdiction to address this question of law. Second, he argues

that his removal proceedings should have been terminated because his notice to appear violated a claim-processing rule by failing to list the date, time, or address for his first hearing. And third, he maintains that the board erred as to the Convention Against Torture because it "cherry-pick[ed]" the record to support its conclusion that he likely wouldn't be tortured upon his removal to Mexico. According to Lopez-Sarabia, this conclusion was "erroneous," "unsupported by substantial evidence," and "contradicted by much of the record in this case which even details numerous acts of torture by Mexican officials themselves." We discuss these three issues in turn.

### Cancellation of Removal

Lopez-Sarabia contends that the board erred in concluding that he was no longer eligible under the Act for cancellation of removal because Lopez, Jr. turned twenty-one during the pendency of the appeal. What matters, Lopez-Sarabia says, is that Lopez, Jr. was still a child at the time of the hearing. Lopez-Sarabia says that we have jurisdiction to review the denial of cancellation of removal because his statutory eligibility presents a question of law. He seeks remand to the board so that it can decide whether the extreme hardship that Lopez, Jr. would endure if Lopez-Sarabia were removed outweighs Lopez-Sarabia's negative factors.

Section 1252(a)(2)(B) states that "except as provided in [section 1252(a)(2)(D)], . . . no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . [1229b]." 8 U.S.C. § 1252(a)(2)(B)(i). Section 1252(a)(2)(D)

provides: "Nothing in [section 1252(a)(2)(B)] . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals . . . ." 8 U.S.C. § 1252(a)(2)(D). Thus, we lack jurisdiction to review a denial of discretionary cancellation of removal under section 1229b unless the "review involves constitutional claims or questions of law." *Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1262 (11th Cir. 2020) (en banc), *aff'd sub nom. Patel v. Garland*, 142 S. Ct. 1614 (2022). "[A] party may not dress up a claim with legal or constitutional clothing to invoke our jurisdiction." *Id.* at 1272. Whether an adult son qualifies as a child under section 1229b(b)(1)(D) is a question of law over which we have jurisdiction. *See id.* at 1282.

While the Act does not deprive us of subject matter jurisdiction to determine whether Lopez, Jr. qualifies as a child because our review of the denial of discretionary cancellation of removal involves a question of law—the interpretation of the word "child" in section 1229b(b)(1)(D)—we need not address Lopez-Sarabia's argument or grant his request for remand because we already know what the board would decide. It told us.

Independently of the qualifying relative issue affecting Lopez-Sarabia's statutory eligibility for cancellation of removal, the board agreed with the immigration judge that Lopez-Sarabia didn't show that he was entitled to cancellation of removal because his "adverse factors, including his convictions for driving under the influence . . . in 2008 and 2015, his history of not paying taxes, and

evidence that he gave a false name when arrested, outweigh[ed] his equities." The board considered Lopez-Sarabia's argument that "his removal [would] result in hardship to his United States citizen son," Lopez, Jr., but it "[n]evertheless . . . uph[e]ld the [i]mmigration [j]udge's conclusion that [Lopez-Sarabia's] significant negative factors . . . outweigh[ed] his equities."

Because this discretionary determination was dispositive, the board didn't need to address Lopez-Sarabia's statutory eligibility, and neither do we. *See Immigr. & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule[,] courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."); *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1326 (11th Cir. 2021) (explaining that "[t]he [b]oard was not required to make an unnecessary determination" about its jurisdiction).

### Violation of the Claim-Processing Rule

Lopez-Sarabia maintains that his notice to appear was deficient as to the time and place of his removal proceedings, in violation of the claim-processing rule set forth in section 1229(a)(1)(G)(i), and that his proceedings should be terminated because of this rule violation.

The requirement that the notice to appear show the time and place of the proceedings is a claim-processing rule that does not affect jurisdiction. *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1152–53 (11th Cir. 2019). We conduct "a harmlessness

inquiry" into violations of this rule. *See id.* at 1154. Lopez-Sarabia does not explain how the violation harmed him, and we discern no harm. Despite the clearly deficient notice, Lopez-Sarabia appeared at his removal hearings. Indeed, he admitted the facts in the notice and his removability under section 1182(a)(6)(A)(i) at a hearing three years before he challenged the notice to appear as deficient.

Because the rule violation was harmless, the board did not err in failing to terminate the proceedings due to the deficient notice to appear.

## The Convention Against Torture

Lopez-Sarabia argues that substantial evidence does not support the board's determination that he was unlikely to be tortured if he were removed to Mexico. He points to country conditions evidence that Mexican officials generally—and La Procuraduría General de la República agents specifically—tortured, and acquiesced in the torture of, suspects in their custody.

To obtain relief under the Convention Against Torture, an applicant must "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture involves, among other elements, an act by which severe pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a government official or other person acting in an official capacity." *Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1288 (11th Cir. 2021) (quotation omitted and alterations adopted). "A government

14                    Opinion of the Court                    21-10582

official acquiesces to torture only if, prior to the activity constituting torture, he has awareness of such activity and thereafter breaches his legal responsibility to intervene to prevent the activity." *Id.* (quotation omitted and alterations adopted). To establish the likelihood of torture, the applicant may present "[e]vidence of past torture inflicted upon the applicant," "[e]vidence that the applicant could [or could not] relocate to a part of the country of removal where he . . . is not likely to be tortured," "[e]vidence of gross, flagrant[,] or mass violations of human rights within the country of removal, where applicable," and "[o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 208.16(c)(3)(i)–(iv).

The record contains evidence that the Mexican government has taken steps to discourage torture. For example, Mexico enacted an anti-torture statute that human rights organizations "commended" as "establishing an absolute prohibition on the use of torture in any circumstance." Also, a special unit within the Mexican attorney general's office devoted to investigating torture had over four thousand ongoing investigations as of June 30, 2017. And Mexican courts ordered over seven hundred fifty criminal investigations into allegations of torture between September 2016 and June 2017. Where a government "actively, albeit not entirely successfully, combats" torture, that government does not acquiesce in torture. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004). Here, the record supports that Mexico has not acquiesced in torture.

Regarding the threat of torture to Lopez-Sarabia in particular, the evidence establishes that the Mexican government never tortured him or even the members of his family who actually interacted with the authorities. Instead, the most serious dangers—for example, Carlos Lopez's death and Ines Lopez's confrontation with gang members—occurred because of criminal, not governmental, activity. *See id.* ("That the police did not catch the culprits does not mean that they acquiesced in the harm. Indeed, were we to follow this reasoning, a person could obtain [Convention Against Torture] relief merely because he was attacked by a gang of neighborhood thugs whom the police were unable to apprehend. The [Convention Against Torture] does not extend so far."). And Lopez-Sarabia testified that his "biggest concern," the "only thing" frightening him, was the general crime in Mexico. This record does not compel a conclusion contrary to the board's. *See Ruiz*, 479 F.3d at 765.

**PETITION DENIED.**